### PENNSYLVANIA R. R. SYSTEM AND ALLIED LINES FEDERATION NO. 90 et al. v. PENNSYLVANIA R. CO. et al.

(District Court, E. D. Pennsylvania.   February 5, 1924.)

#### No. 2875.

**I. Equity ⚖️3—Damage and legal injury both essential to equitable relief.**

Damage and legal injury are as essential to a right to sue in equity as they are to an action at law.

**2. Courts ⚖️352—Evidence of damage held admissible without showing legal injury.**

Under equity rule 46, evidence of damage is legally admissible without previous proof of legal injury; plaintiff being permitted to show a damage,, even though it be ultimately found that he sustained no legal injury.

**3. Master and servant ⚖️69—Suit to compel railroad to confer with employees maintainable as representative suit.**

In a suit by a federated railroad labor union to compel a railroad to confer with its employees, as directed by the Labor Board, defendant's contention that plaintiffs had no right to maintain the suit as a representative or class suit could not be sustained.

**4. Master and servant ⚖️69—Suit in equity lies to compel railroad to confer with employees as directed by Labor Board.**

A suit by a federated railroad labor union to compel the railroad to confer with its employees, as directed by the Labor Board, may be maintained as against the objection that plaintiff has an adequate remedy at law.

**5. Master and servant ⚖️69—Bill to compel railroad to confer with employees held to show damage.**

Where railroad wages as paid under the Railroad Administration, and as reduced by the Labor Board on application of the carriers, were further reduced by a railroad under an agreement with representatives of its employees, who were elected under a plan in which a majority of the votes cast had been thrown out, and which the Labor Board had declared to be invalid, a damage was shown, so as to sustain a bill by a railroad labor union to compel the railroad to confer with employees as directed by the Labor Board.

**6. Master and servant ⚖️69—Court can only consider legal rights and duties in controversy over wage conference.**

In a suit to compel a railroad to confer with representatives of employees as directed by the Labor Board, the only rights and duties which the courts can consider are the legal rights and duties of the parties.

**7. Railroads ⚖️5—Regulation does not invade private rights.**

There is no question of an invasion of private rights involved in the regulation by law of the management of a railroad.

**8. Master and servant ⚖️69—Court cannot make contracts for parties.**

On a bill to compel a railroad to confer with representatives of employees as directed by the Labor Board under the Transportation Act

---

⚖️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

(Comp. St. Ann. Supp. 1923. § 10071¼ et seq.), the court cannot make contracts for the parties, or even tell them what contracts they ought to make.

9. **Master and servant ⬤⟶69—Court cannot review finding of Labor Board as to election of representatives by employees.**

Courts cannot review a finding of the Railroad Labor Board that an election by employees of railroad representatives to a conference with the company to settle disputes was invalid.

10. **Master and servant ⬤⟶69—Court cannot enforce "orders" of Labor Board.**

The District Court has no power to compel a railroad company to obey the orders of the Labor Board, irrespective of whether such orders are called final or interlocutory, since an order may be interlocutory in certain relations, and final in relation to other matters.

11. **Master and servant ⬤⟶69—Railroad held not obligated to pay wages under "national agreement," modified by Labor Board.**

The "national agreement" between the railroads and their employees as to wages, etc., and the modifications thereof by the Railroad Labor Board, having been accepted and followed by a railroad, created an implied contract to pay its employees accordingly; but there being no agreement to continue these payments for any specified time, and the railroad having reduced the wages, and such reduced wages having been accepted by the individual employees, there was no contract or legal obligation on the company to pay the higher wages.

In Equity. Suit by Pennsylvania Railroad System and Allied Lines Federation No. 90 and others against Pennsylvania Railroad Company and others. On motion to dismiss complainant's bill under rule 29 on questions of law raised by answer, on motion to dismiss on bill, answer, and proofs, and on trial hearing on bill, answer, and proofs. Bill dismissed, with exception to plaintiffs.

Donald R. Richberg, of Chicago, Ill., Morris Hillquit, of New York City, and David Wallerstein, of Philadelphia, Pa., for plaintiffs.

John Hampton Barnes, of Philadelphia, Pa., for defendants.

Sur Motion to Dismiss Bill under Rule 29 on Questions of Law Raised by Answer.

Sur Motion to Dismiss on Bill, Answer, and Proofs.

Sur Trial Hearing on Bill, Answer, and Proofs.

DICKINSON, District Judge. The above rather formidable array of subheadings is due to the three ways in which the defendants are pressing their defense to this bill. Rule 29 gives defendants the same right to present the questions of law raised by way of answer which could be raised by a motion to dismiss. The defendants have availed themselves of this right. When at the trial the plaintiffs rested their case, the defendants claimed their further right to move the dismissal of the bill, in the nature of a motion for a nonsuit, on the trial of an action at law, to which trials of suits in equity have now a likeness. Further, at the conclusion of the trial, the defendants asked for a decree dismissing the bill on the finding of a want of equity. Such a decree includes all the grounds of all the motions and disposes of the whole case. There is in consequence no need to determine any other question than that of the decree which should be entered on

trial. There were, however, trial questions raised on the admissibility of evidence which was received under equity rule 46. These may now be first ruled.

[1, 2] There are two essential elements which must be present to give a plaintiff the right to maintain a bill, as they are essential to the validity of a cause of action at law. These are injuria et damnum. The plaintiffs offered evidence of the damage claimed to have been sustained. The defendants objected on the ground that, as the plaintiffs had not shown a legal injury, evidence of damage was wholly irrelevant. The evidence, however, was admissible, as tentatively ruled on the trial, for the reason that, as a plaintiff must show a damage, he is permitted to do so, even although it is ultimately found he has sustained no legal injury. Moreover, rule 46 would require such evidence to be admitted to answer to all the purposes of the rule. Further, the admission, if the evidence of damage is of no effect, is innocuous to the defendant, and, if effective, is proper.

The objections are accordingly overruled, and an exception allowed to defendants.

[3] The grounds advanced by defendants to support a decree of dismissal are many, some of which may be disposed of without discussion, leaving the main ground to be treated more at large. One ground is that these plaintiffs have no right to maintain this bill as a representative or class bill. The dismissal of the bill on this ground is refused. The same, or a substantially like, ground was urged in the case of Fenstemacher v. Railroad Co. (D. C.) 296 Fed. 210, and found to be untenable. To that ruling we adhere, with exception allowed to defendants.

[4] Another ground is that the plaintiffs have an adequate remedy at law. The motion, so far as concerns this ground, is likewise denied, with the allowance of a further exception to defendants. The reasons for the ruling are too obvious to require statement.

Two of the other grounds may be compressed into the one, that no equities in the plaintiffs, growing out of a conspiracy charge, are disclosed by the averments of the bill or shown by the proofs. This question, so far as concerns this court, has been ruled against the plaintiffs in the case of Brotherhood of Clerks, etc., v. Railroad Co. (D. C.) 296 Fed. 218, except with respect to one point, hereinafter discussed, which was not before raised.

The remaining grounds are reiterations, in different modes of statement, of the averment of a want of equity in the complaint and the evidence by which it is supported. This is what we have called the main question. Before entering upon the discussion of it, we wish to make acknowledgment of the helpful aid given us by witnesses and counsel. The former displayed intelligence, accompanied with frankness and candor, and counsel, as was to be expected from their high standing at the bar, argued the questions discussed with not merely clarity, but an intellectual honesty which induced them to accept the logic of the facts presented, whatever the consequences.

The fact situation presented is that which was before us in the Brotherhood of Clerks Case, supra, although in the instant case other questions are raised than those raised by the conspiracy theory to

which the Brotherhood Case was in effect confined. The cause behind each case is the same. It is that cause which gives this case (as it did the other) importance, and gives an excuse, as does the wealth of argument with which we have been favored, if it does not call, for a discussion of its merits, which would otherwise be of undue length.

The facts, in the sense of the evidentiary facts, are few; but, as is almost always the case, the ultimate fact finding to be made and the considerations leading up to it provoke a discussion which is almost unending, because it can be presented in so many phases. This situation reminds us of the magic bottle in the Arabian Night's tale. The bottle itself was very small, but when it was uncorked the genie released was of dimensions which covered the earth and filled the sky. There is a great temptation, which we might perhaps profitably indulge, to make a number of general observations, the bearing of which, although more or less remote, is nevertheless near enough to save the comments from being purely academic. We, however, confine ourselves to one or more, the bearing of which is direct.

Strife between employed and employer is a species of warfare which, like all other wars, often drags neutrals into woes and calamities greater than those suffered by the belligerents. Congress has, because of this, gone as far as it was felt to be wise to go to aid in the peaceful adjustment of such disputes. These disputes, when they exist, are usually over wages or working conditions. A fair wage, like the fair or so-called market price of anything, is commonly treated by economists as the commercial price resultant of the operation of the law of supply and demand. What is meant by this is that this is the main, and in the end the controlling, force at work. Psychological effect, however, practically enters into it very largely, and the artificial restraints of legal enactments, custom, general practices, or public opinion importantly figure in the result. One, if not the chief, value of market price is that it is the expression of the general judgment or general opinion of what, under all the conditions present, is a fair price. This is expressed in monetary terms, and presupposes a stable unit measure of value, which supplies the terms employed. When this standard unit of measurement changes (as it does when the business of the country is run upon a 40-cent dollar), the prices of many things—indeed, most things—in which people deal commercially, reflect at once the change, because prices in those things quickly and almost automatically respond to the changed measure. Rates of wages, salaries, and all measurements, expressed in terms of money, which are fixed by law, by custom, or by agreement, largely influenced by long-established practices, do not thus quickly respond to the change, but are readjusted only upon persuasion.

When the conditions of the situation are such as that the readjustment can be carried into the price of the product, or can be, as the expression goes, "passed on to the consumer," negotiations for wage adjustments are smoothly and amicably conducted. Illustrations may easily be imagined and as readily found in actual practice. Room for suspicion sometimes exists that the "dispute" in such cases is more of a pretense than a reality. When, however, the increased cost of production cannot be thus reflected in the product price, efforts at wage

adjustment become a real strife, because one party gives up or keeps what the other party gets or does not get. If the people who pay the price of the product kept in mind this necessary relation between what they pay and the cost of production, the public opinion, to which appeal is made, would be a that much better informed one. This is peculiarly true of carriers and of all public utilities, as the relation of rates of wages to rates of charge for public service is a direct one.

Labor and capital are both alike, although independently, organized. Whatever else may be said about labor organization, there is no denial of its existence. One reason for its existence is the acknowledged necessity for it. Its most prejudiced opponents list this necessity first in the consideration of the labor problem, and its most zealous advocates name the same fact first among the arguments in its favor. Any one may well believe in the necessity for both labor and capital to be highly organized. Third parties, however, who are not directly concerned, but who suffer when there is strife between them, do not see the necessity to organize them into independent and hostile camps, when their interests are common and they are mutually dependent.

The difference in the attitude of employers toward organized labor divides them into classes. There is a class, or rather the nucleus of a class, the members of which see no need for those whose interests are common to be organized into these independent and hostile camps. The organizers and managers of all ventures, into which the labor problem enters, must enlist the aid of both money power and man power. There must be contributions of both. The inducement to each contributor is a share in what the common product yields. The money power gets its share in the form of dividend checks; the man power return comes in the form of wage checks. It is the job of the management to see to it that there is enough to satisfy both. No one will contribute his money to a venture, except on these terms. Likewise no one will otherwise willingly contribute his labor. The labor problem is solved by the simple expedient of making both checks real dividend checks.

No manager has any difficulty in getting the concept that the money investment in his keeping is held in trust for the owners. It is not a far cry to the like concept that he holds the man power which is likewise in his keeping on a like trust. The money part of the common investment is safeguarded by a perfected organization. The directorate commonly wholly represents it. The management apportions the care of it among departments, each with its responsible head. Why not give some part of a like care to the welfare and safeguarding of the interests of those who have contributed labor to the common capital fund? A management backed by a directorate in which the labor investors had representation and part would form the best possible board of arbitration or Labor Board, and render all others unnecessary. The views of employers of this class are commonly thought to be too fanciful and too chimerical for general acceptance. It may be pointed out, however, that the scheme of central committees and of conferences between these representatives of labor and the managers is something of an approach to these views, and owes whatever merit it has and whatever success attends it wholly to this likeness.

The second class is made up of those who approve of independent labor organization, because they see in it a selfish advantage and convenience to themselves. They see a gain and prefer to deal with representatives of their employees, leaving the labor officials to deal with the individuals. Out of this we get the phrases "union shop" and "closed shop."

The third class is composed of those who frankly are opposed to all such organizations, and see in them no merit and no benefit to any one. They prefer and insist upon their right to deal with their employees as individuals and will tolerate no unionism. This gives us the expression "nonunion shop." It is also, so far as the employer can make it, a "closed shop."

The members of the fourth class concede to their employees the full right and liberty to organize or to remain unorganized, as they may see fit, and look upon labor organizations as they regard other organizations, religious, political, or of any kind, as matters in which the employer has no direct concern. In their dealings, however, with their employees, they insist upon dealing with them as individuals, whether members of a labor organization or not. To plants of this kind there is given the name of "open shop."

There is also a fifth class, which is in one respect a subdivision of the second. Employers of this class limit their recognition of labor organizations and their dealings with their officials to organizations made up solely of their own employees. The number of employees compels a recognition of their representatives. In consequence, such employers approve of the employees being organized, and are willing to promote and aid them in every way; yet they insist upon the officials with whom they deal being themselves employees, and resent the interference of any one between them and their employees who is a stranger to the employment.

This is essentially the attitude of the defendant company, and really bottoms the differences which have provoked this controversy. Out of this have sprung one or more minor differences which claim attention. The main and these minor differences may be best brought into view by an outline fact statement. There is in the general plan of labor organization an interweaving and interlocking of organizations, which gives to the system as a whole a seeming complexity. The general plan, however, is not unlike that of the organization of our several state governments and that of our federal Union. There are local organizations which join in more general ones, and these in turn into those of what may be called wider jurisdiction, very much like the organization of the people of a locality into townships, these again into counties, the counties into states, and the states into the Union. There is likewise the thought of the allegiance of the individual being present throughout all. What may be called the unit of organization does not, however, necessarily arise out of the relation of the individual member to a territorial locality, or to his employer, but to his craft, wherever his fellow craftsmen may be, or in whose employ they may be, although this unit may be made up of territorial or employment units.

296 F.—15

The plaintiff organization is of this federated or union or what may be called parent type, membership in which, or the individuals who owe it allegiance, not being territorially restricted or limited to those working for any one employer. At the inception of this controversy a very large percentage, perhaps as high as from 85 to 95 per cent. of the eligible craftsmen in the employ of the railroad company, belonged to the plaintiff organization. The difference which came to the surface was that most irreconcilable of all differences, one over conflicting principles. The attitude of the managers of the railroad was one of declared desire to consult with its employees and to confer with any representatives of their choice, and of willingness to render aid, financial or otherwise, to them in creating and supporting an organization among them. The company, however, would not consult those who were not its employees, nor confer with the officials of an organization made up (among others) of members who were not such employees. The officials of the plaintiff organization stood out for the right of the men to make their own choice of representatives to act for them at the conference, whether these conferees were employees of the defendant railroad or not.

The supports of these opposing positions are on the part of the employer that his resentment is justified if, for illustration, he, in Philadelphia, is forced to confer, on matters which concern only his employees and himself, with some man from Chicago or San Francisco, or, if the principle be conceded, from Liverpool, Paris, Berlin, or Petrograd. On the other hand, it could well be urged on the part of the employees that there is that difference in the situation of employed and employer that any individual employee is very much handicapped, in any conference, by the thought that his livelihood and that of his family may be dependent upon his meeting the views of the employer, and that his interests in the conference should be committed to the less tremulous hands of a conferee who has no good reason to stand in awe of the power of the employer, and that the most fitting representative of the employees is an organization made up of their fellow craftsmen, without respect to by whom they are employed, and in all events the employees should have the free right to choose their own representatives, the choice of whom the employer has no more right to dictate than the employees would have to dictate who should represent the employer.

This difference could not be reconciled and a strike resulted. The grounds of it are tersely, although somewhat inaccurately, characterized as the refusal of the company to recognize the plaintiff organization. A battle being thus on, the place of it was shifted to the presence of the Labor Board. The pivotal point in the jurisdiction of the Labor Board was evidently thought to be the existence of a dispute which could not be adjusted at a conference of representatives of the parties. Strategy indicated the personnel of the conferees to be the point of vantage. The company in consequence provided the machinery of an election for the choice of conferees to represent the employees.

There were three features of the electoral plan now of importance. One was "regional" representation, another the conferees chosen must

be individuals, and the third that they must be employees. The company backed one ticket. The plaintiff organization, at least to the extent of advising the form of ballot, supported another. The result was that some employees refrained from voting; an overwhelming majority voted for "Federation System No. 90," and a comparatively few votes were cast on the form of ballots provided by the company for individual conferees. The ballots for the plaintiff organization were thrown out and this vote ignored, and the company recognized the individual conferees for whom these few votes had been cast as conferees chosen to represent the employees, and agreed with them upon full scheme of wage payments and working regulations. Since then the company has held to its position that there is no dispute between the company and its employees, but that their relations are harmonious, and in consequence there is no dispute to submit to the Labor Board. The plaintiff and other organizations claiming to represent the employees took sharp issue with the company, and, asserting that there was a dispute, asked the Labor Board to intervene in aid of its adjustment. This the Labor Board proceeded to do by, among other steps, declaring the election held to be invalid, directing another to be held, and prescribing a form of ballot to be voted.

In the meantime the company, by bill filed, sought to have the Labor Board enjoined from functioning. In this the company was unsuccessful, but it has gone along upon the theory of its right to refuse compliance with the rulings of the Labor Board, and to proceed upon its own fact averment that there is no "dispute" of which the board can take cognizance. Aid has been given, financially and otherwise, to what is in effect the company's own plan of organization of its employees, and an electoral plan has been put in operation by which thus far the company has been able to maintain its position by making agreements with the thus chosen representatives of the employees.

[5] In order to have the full position of the plaintiffs before us, it should be further stated that there is a money difference, as well as other differences of value to the employees, between what they get under these agreements, on which the company stands, but which the plaintiffs repudiate as frauds and pretenses, and what the employees would presumedly otherwise receive. As an illustration of one difference, figures may be taken which, although perhaps not mathematically accurate, may be accepted to present the point. Under the railroad administration a craftsman was paid at the rate of 85 cents an hour. Thereafter the carriers, by an application to the Labor Board, had it reduced to 72 cents. Under the agreements on which the company stands, there was a further reduction to 68 cents. There were like changes made affecting seniority, lay-offs, re-employments, and other regulations. The aggregate decrease in the wage scale, as thus contracted, is shown to be large. There has been in consequence a damage.

[6] This brings the whole question to the inquiry of whether there exists a legal injury. So far as this is averred to arise out of the charge of a conspiracy by the defendants to keep the employees out of what it is asserted they ought to have, we have already disposed

of it. This was on the ground that no legal right was asserted. Rights and obligations, which are sometimes termed "extralegal," are recognized by every one everywhere, except in a court, where only legal justice is dispensed. Indeed, the man who has no other than legal standards by which he guides his conduct is commonly thought to hold to a low standard. If, however, he does no wrong which the law condemns, performs every duty which the law enjoins, and asserts no rights other than what the law confers, the law cannot call him to account.

The point is now, however, made, for the first time, that this defendant has not performed every duty which the law enjoins, in that it has refused and is continuing in its refusal to obey the mandate of the Transportation Act to confer with representatives of its employees, as it has been directed by the Labor Board to do. A call is in consequence made upon the judicial power to compel obedience to this mandate. This is the very power which it was admitted in the former case the courts did not possess, but a distinction is now made (which will hereafter be discussed) between an interlocutory "order" and the final "decision" which the board may make. It is still conceded that it is not the legal duty of the defendant to accept any final decision the board may render respecting what is a fair wage scale or fair working regulations, but it is asserted there is a legal duty to obey any interlocutory order to confer, and to confer with conferees who are decided by the board to be the duly chosen representatives of the employees.

A further right or cause of action is also now asserted. It is, in the last analysis, that, by what is called the "national agreement," the employees here concerned had a legal right to the wages and other benefits called for by that agreement, and, by the provisions of the Transportation Act (Comp. St. Ann. Supp. 1923, § 10071¼ et seq.), the terms of the national agreement could not be changed, except by consent of the parties, or their representatives in conference, or, what is the same thing, through an acceptance of a ruling of the Labor Board. The defendant company had in consequence no legal right to affect its employees by any changes in the national agreement, unless there was another agreement reached through a conference between duly chosen representatives of carrier and employees. If this be the right view, then the national agreement (as afterwards changed by an accepted ruling of the Labor Board) is still in force, unless those who agreed to the wage scale, which the carrier has now in force, were duly chosen by the employees to represent them at the conference.

This would reduce the whole question to the one of the validity of the election held. The argument supporting the first position is that the Transportation Act did not, as had been done by previous acts, provide for a voluntary submission of disputes to arbitration, but made it mandatory upon carriers to confer with their employees as set forth in the act. It is true that what agreement should be made might become the subject of a ruling by the Labor Board, which the parties were free to accept or reject; but this did not relieve them from the mandate of the law to hold the preliminary conference. The

distinction is that before made between "orders" made by the Labor Board, to enable it to reach a decision, and the "decision" reached, and further is that the courts can enforce by appropriate process compliance with the "orders," although they cannot compel acceptance of the "decision."

The conclusion we are asked in this case to draw comes to this: That the carrier is committing a continuing legal wrong, for which the injured parties have the legal right to call it to account, unless all disputes with its employees have been adjusted, and they have not been unless the election held was a valid one. If the finding we are asked to make were that the plaintiffs had the right to the decision of the Labor Board and all the advantages which would flow therefrom, it could easily be made. We are prepared to go in one respect much further than counsel for plaintiffs thought it tactful to go.

[7-9] There is no question of an invasion of private rights involved in the regulation by law of the management of a railroad, because every railroad is a public highway which is committed to the custody, care, and operation of the company, or its managers, for public use, and there is the highest authority for the statement, which every Pennsylvania lawyer would accept, that such public highway is no more the private property of the railroad company than a public road belongs to the township supervisors, in whose charge and care it is. We are not, however, dealing with the question of control of the highway, or with its management, but with a question of contract. Certainly no court has any warrant to make a contract for parties who are sui juris, or even to tell them what contract they ought to make. There is the same obstacle in the way of ordering a conference out of which a bargain may come. Of course, if Congress had made it the legal duty of a party to confer, he must confer. "Ita lex legit." Even conceding this, the admitted fact is that the defendant has conferred, if there were duly chosen representatives of the employees present. Some one must resolve this "if." The highest judicial authority (Pennsylvania v. Labor Board, 261 U. S. 72, 43 Sup. Ct. 278, 67 L. Ed. 536) has found that the Labor Board may do this, and they have resolved it in favor of the plaintiff. All danger of a conflict of findings has been avoided by the ruling of the same high authority, which has declared that no court can review or meddle with what the Labor Board has done.

[10] The whole question is thus brought, as counsel specifically admitted at the argument, to the question of whether the court has power to enforce the "orders" of the Labor Board. We have chosen the word advisedly to present the distinction between process to enable a tribunal to function and process to enforce a judgment reached. The distinction thus far is a sound one. An illustration is the loan of subpœna process and of attachment process to secure testimony and evidence to be taken under letters rogatory or the like. One court will thus aid another, when there would be no thought of the enforcement of the final judgment reached upon the evidence thus obtained. The difference between an interlocutory order and a final judgment cannot be determined by the test of a difference in mere verbiage. Both expressions, as are most expressions, are relative.

A ruling may be interlocutory in its one relation, and a final judgment in its relations with something else. This order or decision, whatever it may be called, of the Labor Board, was a final judgment in its relation to the holding of a conference. It may appropriately be called interlocutory in relation to any decision which the board may make respecting a wage scale or working conditions.

Our power to do what we are asked to do, is best discussed in a plain statement of what it is. Thus plainly stated, it is to extend the aid of the court to compel the doing of what the board has ruled should be done. This is the very thing which we have been explicitly told we have no power to do. We, therefore, conclude that this court is without power to compel the defendants to obey the orders of the Labor Board.

[11] The one question left is whether the contractual status, which for brevity will be called that of the national agreement, remains as a binding force upon the defendant company. The fact is found that the defendant is not complying with that agreement, and that a pecuniary and other damage is thereby suffered by the employees, if the company agreement is not in force.

We have already more than reached the length limits of an opinion, and because of this will restrict the further discussion to what is almost a bare statement of the conclusion reached. The view we take is, as already expressed in several different forms, that the only rights or duties we can consider are the legal rights or legal duties of the parties. These arise in this case wholly out of contracts. The national agreement, and the modification by the Labor Board which followed it, having been accepted and followed by the defendants, there would be an implied contract, on its part, to pay its several employees accordingly. There was no agreement to continue these payments for any length of time. When, therefore, the defendants refused to continue the payments, and announced that it would not thereafter pay them, but that payments would be on another and different basis, and since that time it has so paid them, and the individual employees have accepted the payments, we cannot find that there was a contract, or is any legal obligation, of the defendant company to pay more. It will be observed that this conclusion is limited and restricted to the consideration of the legal obligation of debt arising out of contracts made between man and man, because, as we find, this court is not permitted to take any other view.

The other view is not that of a contract between an individual employer and each individual employee, with each enjoying the liberty, which the law gives them, of freedom to contract, but is a wholly different view, taken from the viewpoint of the public interests, and is that employed and employer should each, in the public interest, forego some part of their legal rights, and be contented with whatever bargain chosen representatives may make for them, and, failing this, be content with whatever the Labor Board decided ought to be done. With the latter kind of "agreements" courts of law have nothing to do, unless and until the parties have so agreed by accepting them. The law cannot be otherwise, because, if it were, a man might be compelled by law against his will to work at a wage scale or under

working conditions which were unsatisfactory to him, merely because some one else said he ought to be satisfied. Let it not be lost sight of that the position of the parties to such a "dispute" may at any time be reversed.

The conclusion reached is that the bill be dismissed, with costs, and an exception allowed to plaintiffs. No decree is now made, however, but either party has leave to submit the draft of a decree in accordance herewith, with further leave to the parties to submit requests for findings of fact and conclusions of law, to be answered and the answers incorporated herewith, jurisdiction of the cause being retained for this purpose.