## PENNSYLVANIA R. CO. v. UNITED STATES RAILROAD LABOR BOARD
### et al.

(District Court, N. D. Illinois, E. D.   May 4, 1921.)

No. 2516.

1. **Master and servant ⟜69—Labor Board is a body corporate, and may sue and be sued.**

   The Labor Board, created by Transportation Act 1920, tit. 3, is a body corporate, subject to the jurisdiction of federal courts, and may sue and be sued.

2. **Master and servant ⟜69—Labor Board held only authorized to hear disputes on failure of conference to agree and reference by parties jointly.**

   Under Transportation Act 1920, § 301, it was intended that disputes between carriers and their employees should be considered, and if possible decided, by conference solely between the carrier and representatives of the employees, and the only power given the Labor Board under that section is to hear and decide a dispute which the conferees are unable to decide, and then only in the event that the parties jointly refer the matter to the board.

3. **Master and servant ⟜69—Labor Board not authorized to intervene in conference proceedings prior to reference of dispute.**

   Under Transportation Act 1920, § 301, providing for conferences for the adjustment of disputes between carriers and their employees, the Labor Board is without power to intervene in the proceedings preceding a reference of the dispute to it by the parties jointly, except that under section 307 it may suspend the operation of a decision making a readjustment of rates necessary.

4. **Master and servant ⟜69—Labor Board cannot control or direct method of selecting employees' conference representatives.**

   Transportation Act 1920, § 308 (4), authorizing the Labor Board to make necessary regulations for the efficient execution of the functions vested in it, gives it no right to direct or control the method of selecting persons to represent employees in conferences with employer under section 301.

5. **Master and servant ⟜69—Labor Board's decisions on disputes not submitted are advisory.**

   Under Transportation Act 1920, § 307, the decisions of the Labor Board as to matters other than those submitted to it by the parties jointly under section 301 are advisory only.

6. **Commerce ⟜3—Constitutional law ⟜89(4), 275(2)—Master and servant ⟜69—Act providing for federal Labor Board held valid.**

   Transportation Act 1920, tit. 3, authorizing the Labor Board to ascertain just and reasonable wages and working conditions, is within the power of Congress under its power to regulate interstate commerce, and does not violate the right of private contract, or take property without due process of law, in violation of Const. Amend. 5.

In Equity.   Suit by the Pennsylvania Railroad Company against the United States Railroad Labor Board and others.   On motion to dismiss.   Motion denied.

Decree reversed 282 Fed. 701.

---

⟜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Timothy J. Scofield, of Chicago, Ill. (Frank J. Loesch, Charles F. Loesch, and R. W. Richards, all of Chicago, Ill., and C. B. Heiserman and E. H. Seneff, both of Pittsburgh, Pa., on the brief), for plaintiff.

Blackburn Esterline, Sp. Asst. Atty. Gen. (Charles F. Clyne, U. S. Atty., and Edwin L. Weisl, Asst. U. S. Atty., both of Chicago, Ill., on the brief), for defendants.

PAGE, Circuit Judge. This is a bill by the Pennsylvania Railroad Company against the Labor Board and its members to enjoin them from functioning as a board generally, and specifically from exercising the asserted right to control the selection of the conferees provided for in section 301 of the Transportation Act. Two claims are urged: (1) That the act is unconstitutional if, and in so far as, it attempts to impose compulsory arbitration; (2) that the act gives the board no right on ex parte submission, nor on its own motion, to do any act under section 301.

Defendants move to dismiss the bill, and urge: (1) That the Labor Board is an administrative arm of the government over which the courts have no jurisdiction; (2) that the board had the power exercised by it under decisions 119 (Exhibit 2) and 218 (Exhibit 4). Defendants' so-called answer is no more than a statement of grounds urged for dismissal, with the orders and decisions referred to in the bill attached. What the board did is shown in the exhibits filed, and the only authority therefor is found in title III of the Transportation Act.

I. The Transportation Act is entitled: "An act" (a) "to provide for the termination of federal control * * *"; (b) "to provide for the settlement of disputes between carriers and their employees;" (c) "to further amend" the Commerce Act of 1887. 41 Stat. p. 456, approved February 28, 1920. It consists of five titles, viz.: I. Definitions. II. Termination of federal control. III. Disputes between carriers and their employees and subordinate officials. IV. Amendments to Interstate Commerce Act. V. Miscellaneous provisions. Title III creates the Labor Board and other boards, and also covers the subject-matter of "disputes between carriers and their employees."

Congress, by the act of June 18, 1910, made very complete provision for suits against the Interstate Commerce Commission (36 Stat. p. 539), yet the language in the act of 1887 (24 Stat. 379), creating the Commission, was quite like the language creating the Labor Board, and the Supreme Court, in 1895, said:

"We think that the language of the statute, in creating the commission, and in providing that it shall be lawful for the commission to apply by petition to the Circuit Court sitting in equity, sufficiently implies the intention of Congress to create a body corporate with legal capacity to be a part plaintiff or defendant in the federal courts." Texas & Pacific Ry. v. I. C. C., 162 U. S. 197, 204, 16 Sup. Ct. 666, 669 (40 L. Ed. 940).

[1] In my opinion the Labor Board is a body corporate, subject to the jurisdiction of the federal courts, and may sue and be sued. This does not mean, however, that the courts have any general au-

thority over the exercise of a discretion vested in an administrative body or officer. C., B. & Q. R. R. Co. v. McGuire, 219 U. S. 569, 31 Sup. Ct. 259, 55 L. Ed. 328; German Alliance Ins. Co. v. Lewis, 233 U. S. 389, 34 Sup. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189.

II. The adjustment boards that may be established under section 302 of title III have not been appointed, so that the powers vested in the Labor Board under section 303 need not be considered. Sections 301, 307, 308, and 313[1] have, in the main, been made the subject of

---

[1] Sec. 301. It shall be the duty of all carriers and their officers, employees, and agents to exert every reasonable effort and adopt every available means to avoid any interruption to the operation of any carrier growing out of any dispute between the carrier and the employees or subordinate officials thereof. All such disputes shall be considered and, if possible, decided in conference between representatives designated and authorized so to confer by the carriers, or the employees or subordinate officials thereof, directly interested in the dispute. If any dispute is not decided in such conference, it shall be referred *by the parties thereto to the board which under the provisions of this title is authorized to hear and decide such dispute.*

Sec. 307. (a) The Labor Board shall hear, and as soon as practicable and with due diligence decide, any dispute involving grievances, rules, or working conditions, in respect to which any adjustment board certifies to the Labor Board that in its opinion the adjustment board has failed or will fail to reach a decision within a reasonable time, or in respect to which the Labor Board determines that any adjustment board has so failed or is not using due diligence in its consideration thereof. In case the appropriate adjustment board is not organized under the provisions of section 302, the Labor Board, (1) upon the application of the chief executive of any carrier or organization of employees or subordinate officials whose members are directly interested in the dispute, (2) upon a written petition signed by not less than 100 unorganized employees or subordinate officials directly interested in the dispute, or (3) upon the Labor Board's own motion if it is of the opinion that the dispute is likely substantially to interrupt commerce, shall receive for hearing, and as soon as practicable and with due diligence decide, any dispute involving grievances, rules, or working conditions which is not decided as provided in section 301 and which such adjustment board would be required to receive for hearing and decision under the provisions of section 303.

(b) The Labor Board, (1) upon the application of the chief executive of any carrier or organization of employees or subordinate officials whose members are directly interested in the dispute, (2) upon a written petition signed by not less than 100 unorganized employees or subordinate officials directly interested in the dispute, or (3) upon the Labor Board's own motion if it is of the opinion that the dispute is likely substantially to interrupt commerce, shall receive for hearing, and as soon as practicable and with due diligence decide, all disputes with respect to the wages or salaries of employees or subordinate officials of carriers, not decided as provided in section 301. The Labor Board may upon its own motion within ten days after the decision, in accordance with the provisions of section 301, of any dispute with respect to wages or salaries of employees or subordinate officials of carriers, suspend the operation of such decision if the Labor Board is of the opinion that the decision involves such an increase in wages or salaries as will be likely to necessitate a substantial readjustment of the rates of any carrier. The Labor Board shall hear any decision so suspended and as soon as practicable and with due diligence decide to affirm or modify such suspended decision.

(c) A decision by the Labor Board under the provisions of paragraphs (a) or (b) of this section shall require the concurrence therein of at least 5 of the 9 members of the Labor Board: Provided, that in case of any decision under paragraph (b), at least one of the representatives of the public shall

attack and discussion. In arriving at the purpose of Congress and the right interpretation of the act, it will be helpful to look briefly at previous legislation, and the conditions that produced such legislation.

In 1887, the regulation of common carriers in their relations to the public, particularly as to rates and' service, was inaugurated by the passage of the Interstate Commerce Commission Act (Comp. St. § 8563 et seq.). That act has been extensively amended from time to time, and title IV of the Transportation Act consists wholly of such amendments. At other times, Congress has legislated upon the question of safety appliances and other related matters. In 1888, 1898, and 1913, acts were passed for the appointment of boards of arbitration (25 Stat. 501; 30 Stat. 424; 38 Stat. 103 [Comp. St. §§ 8666–8676]). In none of those acts was there any compulsory submission to arbitration or mediation. Those acts seem to have been produced by conditions in the relations between the carriers and their employees, and were for the purpose of preventing the interruption of business and consequent inconvenience and loss to the public.

The exigencies of the late war made it necessary that the government should take over the operation of the railroads and produced the "Federal Control Act" in 1918 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115⅜a–3115¾p). The termination of federal control is provided for in title II of the Transportation Act.

Late in 1916, after a conference for the purpose of adjusting disputes between the carriers and their employees had failed and steps were being taken to call a general strike, the President said to Congress that there were no resources at law at his disposal for compulsory

concur in such decision. All decisions of the Labor Board shall be entered upon the records of the board and copies thereof, together with such statement of facts bearing thereon as the board may deem proper, shall be immediately communicated to the parties to the dispute, the President, each adjustment board, and the Commission, and shall be given further publicity in such manner as the Labor Board may determine.

(d) All the decisions of the Labor Board in respect to wages or salaries and of the Labor Board or an adjustment board in respect to working conditions of employees or subordinate officials of carriers shall establish rates of wages and salaries and standards of working conditions which in the opinion of the board are just and reasonable. In determining the justness and reasonableness of such wages and salaries or working conditions the board shall, so far as applicable, take into consideration among other relevant circumstances:

(1) The scales of wages paid for similar kinds of work in other industries;
(2) The relation between wages and the cost of living;
(3) The hazards of the employment;
(4) The training and skill required;
(5) The degree of responsibility;
(6) The character and regularity of the employment; and
(7) Inequalities of increases in wages or of treatment, the result of previous wages orders or adjustments.

Sec. 313. The Labor Board, in case it has reason to believe that any decision of the Labor Board or of an adjustment board is violated by any carrier, or employee or subordinate official, or organization thereof, may upon its own motion after due notice and hearing to all persons directly interested in such violation, determine whether in its opinion such violation has occurred and make public its decision in such manner as it may determine.

arbitration to prevent commercial disaster, property injury, and the personal suffering of all, not to say starvation, which would be brought to many among the vast body of the people if the strike was not prevented, and asked for legislation. Congress responded with the Adamson Law (Comp. St. §§ 8680a–8680d). That law has been the subject of wide discussion, and it is not necessary to dwell upon it here, except to note that Congress there provided for an eight-hour day, and made other provisions that resulted in the actual raising of the wages of the employees of carriers. The Supreme Court sustained that act in Wilson v. New, 243 U. S. 332, 37 Sup. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024. The majority opinion was presented by the Chief Justice. Strong dissenting opinions were written, denying the constitutionality of the act.

[2] Not only because of the diversity of opinion expressed in the New Case, but because of its wide public discussion, Congress must have had clearly before it the question as to the conditions under which it had the right, if at all, to establish machinery by which to compel the compulsory fixing of wages, rules, etc., as between carriers and their employees. I am of opinion that, when Congress framed and adopted section 301, it did so with the deliberate intention of imposing, as the plain language of the act indicates, the duty on all carriers and their officers, employees, and agents to exercise every reasonable effort and adopt every available means to avoid any interruption of the business of any carrier growing out of any dispute between the carriers and their employees, and that Congress intended that all such disputes should be considered, and, if possible, decided in conference solely between a carrier and representatives of its employees directly interested in the dispute, and that, as hereinafter noted, the only power given to the Labor Board under that section was to hear and decide a dispute which the conferees provided for in section 301 were unable to decide, and then only in the event that the parties jointly referred the matter to the board.

[3] The further conclusion is inevitable that the Labor Board was without power to intervene in any way in the proceedings contemplated by section 301 preceding a reference to it jointly by the parties, except that the board might on its own motion suspend the operation of a decision by the parties if it was of the opinion that such decision as to salaries and wages would make a readjustment of the rates of any carrier necessary, and thereupon as soon as practicable affirm or modify such suspended decision (section 307b).

[4] It is, in a general way, claimed that the board has the right to direct or control the method of selecting the representatives of the employees under section 301, under the provisions of section 308 (4), which is as follows:

The Labor Board "may make regulations necessary for the efficient execution of the functions vested in it by this title."

The appointment or method of election of conferees under section 301 was not one of the functions delegated to the board, and therefore it had not the right to make the regulations provided for in decision No. 218 on pages 8, 9, and 10. I am of opinion that the purpose

of section 301 was to leave to the carrier and its employees full liberty to get together in their own way. The language of section 307 strongly supports my conclusion upon section 301, because section 307 makes ample provision for intervention on the part of the Labor Board in all cases arising under the act, where the carrier and the employees have failed to compose their difficulties, or upon such failure to join in a submission to the Labor Board, as provided in section 301. This will more fully appear from the following discussion.

[5] III. As noted above, no adjustment board has been appointed; therefore section 307 may be read without consideration of the provisions therein relating to the adjustment board. Such a reading shows that the Labor Board shall receive for hearing, and as soon as practicable and with due diligence decide, any dispute involving grievances, rules or working conditions which is not decided as provided in section 301, under the following circumstances:

"(1) Upon the application of the chief executive of any carrier or organization of employees or subordinate officials whose members are directly interested in the dispute;

"(2) Upon a written petition signed by not less than 100 unorganized employees or subordinate officials directly interested in the dispute, or,

"(3) Upon the Labor Board's own motion if it is of the opinion that the dispute is likely substantially to interrupt commerce."

The meaning of that language is too plain to need interpretation or construction. Section 307 (b) authorizes the intervention of the Labor Board in precisely the same manner as provided in section 307 (a) for the purpose of deciding "all disputes with respect to the wages or salaries of employees or subordinate officials of carriers, not decided as provided in section 301."

In considering the intent of Congress as to the force of the Labor Board's decisions as to other matters than those jointly submitted to them under section 301, there are two views pressing upon the mind of the court for consideration:

(1) Do the provisions of the act authorize the Labor Board merely to hear, determine, and publish in an advisory decision that which in its opinion would be a fair and just wage, or what would be a fair and just solution of disputes involving grievances, rules, or working conditions? or

(2) Does the act authorize the Labor Board to make such findings, and to render such decisions and judgments as will make its determination upon those questions final and binding, so that a rule, determined to be a fair and reasonable rule by the board, shall thereafter be a governing rule between the parties, and so that a wage determined to be a fair and reasonable wage shall thereafter be the wage that shall be paid by the carrier, and that shall be accepted by the employee, and that may be recovered in the courts?

There is no direct provision in the act that decisions by the board shall be final and have the binding force of decrees to be performed. Nor is there any provision that that which is determined to be a just and reasonable wage or rule shall thereafter be the wage or the rule as between the carrier and its employees and upon which either may

maintain an action in the courts. There is no provision for the enforcement of the terms of the decisions, nor any penalties for their violation, except the publication provided for in section 313, if that may be considered a penalty.

All those matters seem to me to indicate that the decisions are only advisory. On the other hand, section 307 (d) provides that:

"All decisions of the Labor Board * * * shall establish rates of wages and salaries and standards of working conditions which in the opinion of the board are just and reasonable."

Nevertheless I have reached the conclusion that it was the belief of Congress that the results desired by the legislation could be attained through the force of public opinion and that that public opinion would follow the publication made as provided in sections 307 (c) and 313, and would support the decisions of a board, composed of men each of whom would have special knowledge of the difficulties within and the necessities of the group that he was chosen to represent. I am further of the opinion that, acting upon that belief, Congress provided in section 307 (d) for a wide and searching investigation, so that the board would have before it all the facts necessary to enable it to reach just and reasonable decisions upon every dispute.

[6] IV. The remaining—and, of course, fundamental—question in this case is whether or not the act is within the constitutional power of Congress to regulate commerce. In Gibbons v. Ogden, 22 (9 Wheat.) U. S. 1, 188 (6 L. Ed. 23), Chief Justice Marshall said:

"Commerce, undoubtedly, is traffic, but it is something more—it is intercourse. It describes the commercial intercourse between nations, * * * and is regulated by prescribing rules for carrying on that intercourse."

After an extended discussion, the court further said (9 Wheat. 195, 6 L. Ed. 23):

"We are now arrived at the inquiry—what is this power? It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the Constitution."

Undoubtedly some character of intercourse by transportation is involved in every completed commercial transaction. Boys trading upon the playground or men trading in the market places make and lay the basis for their transactions by discussion or correspondence, but the commercial transaction must somehow, somewhere, be completed by delivery. It may be the mere passage of the commodity involved in the trade from the pocket of one by hand to the hand of another, or it may be the carrying across the continent of bulky commodities, involving every kind and character of handling and transportation devices, and of men engaged in many kinds of employment; but, whatever be the character of the transaction, whether it is great or small, the instruments of intercourse and transportation are indispensable elements in every commercial transaction.

The commerce dealt with in the act in question involves the main transportation systems both for passengers and freight for the people of the whole United States. It reaches, touches, and carries for every

city, village, and town, and is the instrument by which food, clothing, and fuel, and every other commodity of commerce, is carried for and between the people. There is nothing in existence that could be substituted for it, and it represents the growth of years. If its operation were to be discontinued for even a short space of time, the loss and hardships necessarily consequent thereon would be almost incalculable; and if it were discontinued for any considerable length of time the whole fabric of the nation's commerce and the foundations of our manufactures, which are the basis of the great growth and development of our country and of our business prosperity, would be almost irretrievably wrecked.

Neither bigness nor emergency can bestow or add to the constitutional power to regulate commerce, and I have set out the matters immediately foregoing for the sole purpose of illustrating the large place which the agreements and disagreements between carriers and their employees occupy in the transportation element of interstate commerce, and how inadequate must be the regulation, if Congress does not have the power to control such agreements and disagreements. It is of the fundamentals of a common carrier system that it shall be as efficient as the conditions in business will permit, that it shall be continuous, that it shall give equal service to all of the people upon equal terms, and that it shall have fair and reasonable compensation for the services rendered.

I can see no difference in character between those regulatory powers sustained and in operation under the Interstate Commerce Act for more than 40 years and the power to ascertain just and reasonable wages and working conditions as contemplated in title III of the Transportation Act. If the power to regulate commerce is a power to prescribe rules by which commerce is to be governed, then Congress must have the power to prescribe every regulatory or governing measure necessary to keep the commerce of this country alive and the common carriers going concerns. If the common carrier system of this country may lawfully be stopped for one hour by the carrier or by the employees, organized or unorganized, not by reason of any necessity in the business of common carrying, but because either party wills it, or through the disagreement of the parties, then it may be stopped for the same reason, or for no reason at all, for an indefinite time or perpetually, and the constitutional power of Congress would be as impotent and useless as a dead hand upon the ship's rudder in a storm.

In the case of Wilson v. New, 243 U. S. 332, 37 Sup. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024, the constitutionality of the Adamson Act was challenged by some of the dissenting justices upon the ground that it violated the Fifth Amendment, first, because an attempt to fix any wage is in violation of the right of private contract; and, second, that the provision in the Adamson Act that only an eight-hour service by an employee should be given for ten hours' pay was in violation of the inhibition in the Constitution against taking property wthout due process of law. The argument there was that the act, without any investigation on the part of Con-

gress or under its authority as to the conditions of pay and employment in the carrying trade, wrongfully and arbitrarily gave to the employees some $600,000,000 of the carriers' money. The method that was there asserted to have been an arbitrary exercise of power is not present in this case. The act here, on the contrary, makes very careful provision, as hereinbefore shown, for the selection of a well-qualified board, and prescribes a wide field of investigation and a careful consideration of every ·element involved, to the end that conclusions may and shall be reached by the Labor Board which shall be just and reasonable.

Upon the question of the right to prescribe compulsory arbitration or to fix wages, the majority opinion of the court in the case of Wilson v. New, supra, determines that question, supports the power exercised by Congress, and consequently sustains the constitutionality of the act. There is, and can be, no conflict between the Fifth Amendment and the commerce regulation clause of the Constitution, because, whenever men and property enter into and become a part of an interstate common carrier system, they so far lose their private character that they become wholly subject to all reasonable regulatory measures prescribed by Congress.

Motion to dismiss is denied.

---

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

