COFFEE *et al. v.* GRAY, receiver, *et al.*

1. Where a receiver of a railroad company made an application to the court of his appointment for authority to reduce the wages of his employees, and the court caused to be published notice calling upon persons at interest to show cause why this should not be done, and where in obedience to such notice certain of these employees appeared in behalf of themselves and the other employees, and asked to be made parties, and offered a demurrer to the application, on the ground that the court was without jurisdiction to authorize the receiver to make such reduction, but that such jurisdiction was vested exclusively in the United States Labor Board under the transportation act of 1920, such employees had such an interest in this proceeding as entitled them to be made parties; but where the court refused to make the employees formal parties, but permitted them to appear and be heard upon their demurrer, which was

the only defense they wished to make to the receiver's application, the refusal to make them formal parties in the case does not require a reversal of the final judgment.

2. The transportation act of 1920 was not intended to apply to a receiver of an insolvent railroad, when the effect of such application would violate the fifth amendment to the constitution of the United States; and a court appointing a receiver could authorize him to reduce the wages of employees, independently of such act, where the railroad was not earning enough revenue to pay operating expenses, including the scale of wages in force when the receiver took charge of its operation, and when the continuance of the payment of such scale of wages would amount to an encroachment upon, and final consumption of, the property of the railroad company, or where such payment of wages would cause a suspension of its operation.

No. 4180. April 29, 1924.

Receivership, etc.    Before Judge J. B. Jones.    Habersham superior court.    November 15, 1923.

On June 25, 1923, the Southern Railway Company, a Virginia corporation, in its own behalf and of such other creditors as might join therein, filed an equitable petition against the Tallulah Falls Railway Company, a Georgia corporation, having its principal office in Habersham County, this State; and made substantially this case: The defendant company is indebted to petitioner in the aggregate sum of $1,155,472.22, which is made up of interest due on a mortgage indebtedness, moneys advanced by petitioner to defendant to pay taxes and current liabilities, and traffic balances due by defendant to petitioner upon its interchange of business between them. The defendant is indebted to others in the sum of $5,632.49 or more, which it is unable to meet. The defendant owns and operates a railway which extends from a connection with the Atlanta & Charlotte Air-Line Railway which is operated by petitioner, at Cornelia, Habersham County, Georgia, and which runs through the counties of Habersham and Rabun in Georgia and the county of Macon in North Carolina, a distance of 58 miles, to the town of Franklin, the length of said road in Georgia being 43.5 miles. The defendant has no assets of any account except its lines of railroad and properties appurtenant thereto. Its outstanding indebtedness is $1,519,000. Bonds representing this indebtedness were issued on March 1, 1909, and secured by a first mortgage made by defendant to the Standard Trust Company of New York, as trustee for the holders of said bonds. Said bonds bear interest at the rate of 5 per cent. per annum, payable semi-

annually. No installment of interest on said bonds has ever been paid; and there is now actually outstanding and due petitioner as interest the sum of $1,016,930.

During the period of Federal control of railroads, the defendant's lines were taken over and operated by the Federal Government, which resulted in an aggregate deficit for the years 1918, 1919, and 1920 of $115,288.26. The properties of the defendant were returned to it on March 1, 1920, and since then and up to the present time have been operated by it. Since March 1, 1920, the railway of defendant has been operated at an aggregate deficit of $207,206.13. On account of these deficits defendant has been compelled to obtain advances from petitioner and from other sources to pay for actual expenses of operation, without making provision for its bonded indebtedness or other liabilities. The defendant can no longer obtain advances from petitioner or other sources or borrow money from any source with which to meet obligations and conduct its operations. Defendant has reached the point where, if it relied on its own resources, it could not operate its railroad. Defendant is hopelessly insolvent; and will be forced to suspend operation unless measures are taken by this court to avert such suspension. Suits will be begun in various courts; liens will be asserted against it; and its assets in this way will be wasted, and the common interest of its creditors will be jeopardized and suffer materially. Defendant will be subjected to a multiplicity of conflicting suits in various jurisdictions, and to much harassment therefrom. The point will be reached when petitioner can no longer forbear from exacting from defendant at least present and current liabilities, such as traffic balances, rent of equipment, etc., and petitioner can make no further advances to defendant in aid of its operations. It is imperatively necessary, for preservation of defendant's assets and continuous operation of defendant's lines, to appoint a receiver to take over its operations. Defendant is in default upon taxes assessed and levied against it for State and county purposes for 1922. Its depot and land located at Clayton, Georgia, have already been levied on by the sheriff of Rabun County, and the same is advertised for sale; and unless defendant and its properties are taken in hand and administered by a court, other levies shortly and from time to time will be made. On account of these facts the cessation of

the operation of defendant as a carrier is threatened, and such would be disastrous to creditors as well as to the public.

Petitioner prayed, that the court entertain its petition and in due course render judgment in its favor for the sum which it shall prove to be due it by defendant; that a receiver be appointed to take charge of all the defendant's assets in Georgia; and that the court enjoin all parties to whom the defendant may be indebted from bringing suits in any courts against the defendant; that all parties be required, by order of the court, to litigate their claims against defendant in this court; and that steps be taken to prevent cessation of the operation of defendant's railroad.

On October 8, 1923, the receiver filed a report touching the finances and operations of this railroad, and therein recommended a reduction in the pay of engine and train men, shop, bridge, and roadway forces, station agents, and other employees. Thereupon the judge ordered that a notice be published in a newspaper, advising all persons concerned that a hearing would be had October 31, 1923. Said hearing was accordingly had, and G. W. Coffee, W. W. Blair, and J. D. Miller, employees of defendant, representing all its employees as a class, appeared by their attorneys, and made their motion for leave to intervene as parties defendant with all rights as such, and prayed for an order making them such parties. At the same time said parties presented their demurrer to the receiver's petition, denying the jurisdiction of the court over the subject of wages and working conditions of the employees of said railroad under the transportation act of 1920. The court denied the motion to be made parties, and entered this judgment: "The court is of the opinion that this proceeding is not a lawsuit in the sense that parties should be made, but the court will hear the question of want of jurisdiction in the premises." In conformity with leave granted, movants presented through their counsel their views and arguments in support of the demurrer; and the court proceeded to hear evidence on the recommendations made by the receiver. The intervening employees introduced no evidence, but relied solely on the point that Habersham superior court was without jurisdiction in this matter. Thereafter, on November 15, 1923, the judge rendered this judgment: "Application was made to the court by the receiver of the Tallulah Falls Railway Company for a review and reduction of wages for certain of the employees

of the railway company now in the employment of the receiver. That the matter might be better understood, under a published notice to all concerned, a hearing was had in the court-house at Clarkesville, Georgia, on October 31st, 1923, at which time many of the employees appeared; but no evidence was submitted except from the receiver, who submitted oral testimony as well as filed many documents with the court. Certain classes of the present employees of the company were represented by attorneys, who made the point that the court did not have jurisdiction in the premises, as the labor board alone had jurisdiction to pass upon the question of salaries of engineers, conductors, trainmen and station agents. · The court was of opinion that this proceeding was not a lawsuit in any sense; that it was simply a hearing to determine the wages the court would authorize its receiver to pay any one he might employ in the future to work for him as receiver, and that this responsibility, however onerous, could not be shifted by the court to any one else.

. "The proceeding under which the receiver was appointed shows an indebtedness to the Southern Railway Company for bonds in the sum of one million five hundred thousand dollars principal, on which interest amounting to $75,000.00 per year had never been paid, and further indebtedness to the same company in the sum of one million two hundred thousand dollars on account of advances made at various times in the past. And to others than the Southern, in something over $5,000.00. From the evidence at hand the Tallulah Falls Railway has continuously been unable to pay its expenses from its own resources; falling behind from year to year in varying amounts. The operating loss for 1922 appears to be $10,548.13, which was the smallest loss for any year since 1917. Besides these items of indebtedness there are pending damage suits aggregating the sum of $101,150.00. The Southern Railway Company, who appear to be the owners of these bonds and stock of the defendant company, bring this suit, and say they are not going to pay another cent on it, and are not going to run it. Even if. a court were so disposed, there is no earthly way to compel them to do it.

"It was argued that the Southern would not allow this road junked, because it was too good a feeder to the main line. I don't know about that. I only know that it set in motion this proceed-

ing that may compel its being disposed of in some way. It must be borne in mind that the Southern has no competitor in this section, and it has the right to compel the shipper to bear the expense of delivery to Cornelia, rather than do it itself at a loss every year. Any one at all familiar with the history of short-line railroads in this State must know that many apparently good ones have been junked in the last few years. As I recall it, this road, when finished to Tallulah Falls, was actually given away to Bailey Thomas, in Athens, who ran it for a few years and failed; and it was sold for $2,500.00 to Mr. Prentis and his associates, who finished it to Franklin, N. C., and ran it a few years, and they busted all to pieces. In some way the Southern became the owners of the bonds and began running the road. Now it has thrown it down and says it's through, and it's up to the receiver acting under orders from the court.

"I could order the receiver to sell it, but who would buy it? Wouldn't that mean junking it? Yet, that's exactly what I will have to do unless the receiver can run it so as to make it pay expenses. I would hate to do that, because I know the country through which it runs, and there is no better section anywhere that I know of. I am going to do all I can to keep this road from being junked, and to that end I am going to sustain the receiver in all matters that seem to be necessary and right. Of course I regret the necessity to reduce the wages of the loyal and faithful employees, who have been so long with the company, and would not do it were it not absolutely necessary. So, I approve and allow the recommendations made by the receiver, and he is ordered to pay the wages he suggests as per his petition of file, which amounts to about 50% more than the wages paid in 1917. The agencies at Hollywood and Rabun Gap will not be discontinued, but the salary paid will be as recommended by the receiver; likewise the salary of the agent at Turnerville is reduced and fixed as recommended. The intervention by the Town of Tallulah Falls is meritorious, and so soon as the finances and conditions of the road are bettered the receiver will be ordered to make the street-crossing safe for the required distance. Though not recommended by the receiver, yet, in the interest of economy which the court will undertake to inaugurate, the office of superintendent is abolished, which is saving $300.00 per month. The salary of master mechanic is

reduced from $240.00 to $175.00 per month, and the salaries per month of the following officers are reduced and fixed at these amounts: chief clerk from $150.00 to $125.00; chief dispatcher from $185.00 to $145.00; road master from $190.00 to $150.00; auditor from $200.00 to $150.00; freight clerk from $140.00 to $120.00.

"It must be distinctly understood that this railroad cannot now be operated like a main line—it has no credit and no means of raising money, and must sink or swim on its own resources; and this road's resources are its receipts from freight and passenger fares. On a direct inquiry from the court the receiver reports that the present office force is necessary in operating the road. To the court it appeared that the force in the office was larger than was necessary, and in the future if it should appear that the force should be lessened it will be done. The salaries herein fixed are to go into effect December 1st, 1923. The salaries and wages herein fixed very nearly approximate those paid by the receiver for the Gainesville Midland, a railroad seventeen miles longer than the Tallulah Falls Road.

"If it should appear that the receipts of this road will not be sufficient to pay its own expenses and keep its track, road-bed, trestles and cars and engines safe, then I will be forced to order it sold. It would be criminal to allow a railroad operated when in an unsafe condition. . . ."

Coffee, Blair, and Miller, in their own behalf and as representatives of the employees as a class, excepted to the refusal to make them parties defendant, the refusal to sustain their demurrer to the receiver's petition, in the nature of a plea to the jurisdiction of the court, and the refusal to hold he was without jurisdiction to consider and adjudge the relief prayed for in the petition of the receiver, for the reason that under the Federal transportation act of 1920, sole jurisdiction over the subject of wages and working conditions of employees of railroads engaged in interstate commerce was placed with the United States Railway Labor Board. The evidence introduced on the hearing is not in the record, but the findings of fact by the judge are set out in his judgment.

*Hooper Alexander* and *Shackelford & Shackelford,* for plaintiffs in error.

*Sanders McDaniel, Charters, Wheeler & Lilly,* and *A. W. Horn,* contra.

HINES, J. (After stating the foregoing facts.) 1. We think the employees had such an interest in this proceeding as entitled them to be made formal parties. The application of the receiver was to cut their wages. He was proceeding in equity. In this matter the employees had a vital interest. All persons interested in litigation should be parties to proceedings for equitable relief. Civil Code (1910), § 5417; *Houston* v. *Redwine,* 85 *Ga.* 131 (11 S. E. 662). Besides, the chancellor had invited the employees to show cause why the relief sought by the receiver should not be granted. The response to this invitation should have been by proper pleadings by the employees, rather than in mass-meeting or mob form. But as the chancellor permitted them, although not made formal parties, to be heard upon their written demurrer, which raised the question that the court was without jurisdiction to authorize its receiver to reduce the wages of employees, and that exclusive authority was vested in the United States Labor Board to reduce the wages of employees of an interstate carrier, and inasmuch as this was the only response which the employees wished to make to the receiver's application for reduction of their wages, and as the chancellor considered and decided this question, we do not think his failure to make them formal parties to the proceeding requires a reversal of the judgment in this case.

2. Did the chancellor have authority to reduce the wages of the employees of this carrier, independently of any action of the United States Labor Board, under the facts of this case? One who devotes his property to public use subjects it to public regulation. Munn *v.* Illinois, 94 U. S. 113 (24 L. ed. 77). But such regulation must be reasonable, and not arbitrary. To require a railroad company to continue in business at a loss is beyond the powers of Congress or a State. "Apart from statute or express contract, people who have put their money into a railroad are not bound to go on with it at a loss, if there is no reasonable prospect of profitable operation in the future." Bullock *v.* Florida, 254 U. S. 513 (41 Sup. Ct. 193, 65 L. ed. 380) ; Brooks-Scanlon Co. *v.* Railroad Commission, 251 U. S. 396 (40 Sup. Ct. 183, 64 L. ed. 323). Nor can a railroad company or a receiver of such company be required to operate a railway on a scale of wages which produce

15

continual loss, and which will finally eat up the corpus of the property. Under our constitutional system of government, there is no power in or out of Congress, in a State, or in the judiciary to compel those who devote their property to the use of the public to operate the same at rates or wages which occasion loss. In good morals neither the public nor the employees should demand such sacrifice. So, while the Adamson law was held constitutional (Wilson *v.* New, 243 U. S. 332, 37 Sup. Ct. 298, 61 L. ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024), the Supreme Court of the United States held that this law, "although by its general terms purporting to apply to all railroads and railroad employees subject to the act to regulate commerce, was not intended to govern the exceptional case of an insolvent railroad operating at a loss under an agreement with its men, which they desired to keep, allowing them less wages than the act prescribed." Ft. Smith &c. R. Co. *v.* Mills, 253 U. S. 206 (40 Sup. Ct. 526, 64 L. ed. 862). It is true in that case the employees agreed to accept wages lower than those prescribed by the Adamson law; but that fact was not the determining factor in the decision in that case. The determining factor was, that the Adamson act "was not intended to govern the exceptional case of an insolvent railroad," and was never intended to apply when its application would violate the constitution of the United States. In that case the court, referring to Wilson *v.* New, supra, said: "It was not decided that there might not be circumstances to which the act could not be applied consistently with the fifth amendment, or that the act in spite of its universal language must be construed to reach literally every carrier by railroad subject to the act to regulate commerce." Under the circumstances of this case, the transportation act cannot be applied consistently with the fifth amendment to the constitution of the United States. We should give that act a construction which will not infringe that amendment. Under that amendment, Congress cannot require a railroad company to pay wages which the company does not earn, and payment of which will consume its property. So in St. Louis Union Trust Co. *v.* M. & N. A. R. Co., 270 Fed. 796, it was said: "In view of the provisions of Const. U. S. Amend. 5, the receiver for railroad property which has been operated at a continuous loss, both before and since the receivership, and where the gross earnings are insufficient to pay operating

expenses, and money can no longer be borrowed on receiver's certificates, may be authorized to reduce wages of employees below the scale fixed by the United States Railroad Labor Board by decision No. 2, in effect May 1, 1920, without being subject to the penalty provided by transportation act, § 312." If this can be done after the labor board has made an investigation and fixed reasonable wages, it certainly can be done when no such investigation has been made and no decision rendered by that board fixing wages. In this case the railroad company has never met the interest on its bonded indebtedness, and has now past-due interest on its bonds of $1,016,930. It has never declared a dividend on its stock, and has never been able to earn its operating expenses. While under government control during 1918, 1919, and 1920, it did not earn operating expenses, and there were large annual deficits, aggregating $115,288.26. After it was turned back to its owner the same thing occurred. Since March 1, 1920, these deficits have aggregated $207,206.13. The defendant is hopelessly insolvent, and will be forced to suspend unless drastic measures are taken by the court to avert such suspension. The company was in default in the payment of taxes assessed against it before it was put in the hands of a receiver. This railway is in need of repairs and betterments, and is without funds to pay therefor. Money can no longer be borrowed to pay the operating deficits. Under these circumstances, the receiver is not earning the money with which to pay the wages which the employees were getting at the time he made this application to the court for authority to reduce. Not earning the money with which to pay these wages, the only recourse left would be to borrow upon receiver's certificates, if that could be done, and thus burden the property with the payment of the money borrowed to meet wages which the railroad was not earning. This would amount to the taking of the property of the railroad company in violation of this amendment to the Federal constitution. Such a construction should not be put upon the transportation act as would lead to this dire result. So we are of the opinion that the transportation act was not intended to apply to a receiver engaged in the operation of an insolvent and crippled railroad, when the latter is not earning money enough to pay operating expenses, including the scale of wages which was of force at the time of his appointment, and

where by a reduction of wages an entire suspension of operation and the destruction of the property may be prevented. The employees will not and cannot be compelled to accept the reduced wages, while the property will have to be operated or the owners will lose it.

3. Applying the rulings enunciated in the foregoing division of this opinion, they dispose of the merits of this controversy; and it is unnecessary to discuss any of the other points raised and discussed in the briefs of counsel.

*Judgment affirmed. All the Justices concur.*