## SCHUPPAN v. PEORIA RY. TERMINAL CO.

(District Court, S. D. Illinois, N. D. November 8, 1924.)

No. 199.

**1. Master and servant ⟺69—Railroad Labor Board may only decide what is reasonable pay.**

Under Transportation Act (Comp. St. Ann. Supp. 1923, § 10071¼ et seq.), Railroad Labor Board can do no more than determine what is reasonable rate of pay for railroad employés, and statute is not intended to take away employer's right to employ and fix rate of pay.

**2. Master and servant ⟺69—Railroad employés, by continuing employment, accepted management's proposition to pay reduced wages.**

Where management of railroad in financial straits notified employés that company would pay them all railroad's income proportionately after deducting current supply bills, and if they did not wish to accept to seek services elsewhere, employés by continuing in employment accepted such proposition, subject to right of Labor Board to investigate and give parties moral sanction of decision.

**3. Master and servant ⟺69—Operation of railroad on scale of wages causing loss not required.**

Apart from statute or express contract, people putting money into a railroad are not bound to go on with it at a loss, if there is no reasonable prospect of profitable operation in the future, nor can company or its receiver be required to operate on scale of wages producing continuous loss.

**4. Master and servant ⬅69—Railroad employés held not entitled to credit for difference between pay offered and rate prescribed by Labor Board.**

Where management of railroad in financial straits announced that after certain date it would divide all income, after paying supply bills, among employés, which "will constitute your full and final compensation," employés could not claim a credit for difference between Labor Board's wage scale and amount received, payable at future date.

**5. Master and servant ⬅69—Railroad held not required to procure Labor Board's consent to change in pay.**

Railroad management, which gave employés full and clear notice of change in rate of pay, was not required to procure consent of Labor Board before putting change into effect.

**6. Master and servant ⬅69—That railroad employés misinterpreted rights held not to warrant ordering receiver to pay difference between wages received and rate fixed by Labor Board.**

That railroad employés misinterpreted their rights under Transportation Act (Comp. St. Ann. Supp. 1923, § 10071¼ et seq.), and continued to work after receiving notice from railroad management of change in rate of pay, *held* not to warrant court in ordering railroad's receiver to pay difference between amount received and rates fixed by Labor Board.

In Equity. Suit by A. E. Schuppan against the Peoria Railway Terminal Company. On defendant's exceptions to report of master allowing claims. Exceptions sustained, and claims disallowed.

Joseph A. Weil and Joseph F. Bartley, both of Peoria, Ill., for claimants.

Miller, Elliott & Westervelt, of Peoria, Ill. (Frank T. Miller and Bruce E. Dwinell, both of Peoria, Ill., of counsel), for receiver.

FITZHENRY, District Judge. In the progress of this cause a large number of claims against the defendant were filed with the receivers. Many of them were for wages by former employés of the defendant. The property of defendant consists of about 10 miles of track, running southward from Peoria on the west side of the Illinois river, crossing the river upon its bridge at Pekin, as well as terminal facilities at Pekin, and switch tracks running to the various industries along the line of the property. During the World War it was taken over by the government and was under federal control. While under federal control, it became subject to all orders affecting wage scales and working conditions.

When the railroad was turned back to its owners, and the provisions of the Transportation Act (Comp. St. Ann. Supp. 1923, § 10071¼ et seq.) became operative, the defendant company endeavored to operate under the provisions of decision No. 2 of the Railroad Labor Board. After the guaranty period had expired, September 1, 1920, the defendant company found it extremely difficult to continue operations. It was in financial straits, suggesting its abandonment. On February 17, 1921, the general manager, Mr. H. I. Battles, called the employés together and explained the financial condition of the road to them, advising them, in effect, if there was a continuation of operation, it would have to be by reason of a substantial reduction in operating cost. What was done at that meeting was described by Mr. B. F. Hogue in his testimony before the master. Mr. Hogue later appeared as the chairman of the committee representing the employés of the defendant company. He was asked the questions and made the answers following:

"Q. Mr. Battles had told you that the financial affairs of the company were in a very precarious state, didn't he? A. Yes, sir.

"Q. Didn't he tell you there was one of three things that had to be done, namely: Either make a horizontal cut in wages, that is, No. 1; or, No. 2, pay all the money obtained after the necessary material bills are paid, and pay all that is left to wages proportionately, that is No. 2; or, No. 3, that the road would have to stop running? A. No, sir. The third was to leave the service and seek service elsewhere.

"Q. In other words, the men were either to agree to a reduction to be made, a horizontal cut or flat basis, or leave the service? A. Yes, sir; that was his request."

A large number of employés attended this meeting. Shortly thereafter a meeting was held at Pekin, at which all of the employés were present or represented. On or about February 21, 1921, the committee reported to Mr. Battles that the men had had a meeting, at which they were all present or represented, and elected a committee, of which he (Mr. Hogue) was chairman, and had directed the committee to advise him (Mr. Battles) the employés would not accept either of the propositions suggested at the meeting of February 17th. All of the employés continued in their several employments. At the outset of the meeting Mr. Battles, in the conversation, had told the employés they would get their regular pay up to and including February 15th, but after that date they would only get what the company could pay them.

There was some discussion back and forth,

9 F.(2d)—29

when, on March 1st, the defendant posted a bulletin, addressed to all employés, reciting what had been done and said at the meeting of February 17th; that on February 21st the committee waited upon the manager, and notified him that the employés had finally decided they would not accept either proposition. Among other things, this bulletin contains the following:

"I am, therefore, obliged to give you formal notice that, beginning with the period February 16th, you will receive on each pay day your proportionate share of the current income of the company, after allowing for the payment of current bills for fuel, current supplies, etc., and that the amount you so receive on each pay day will constitute your full and final compensation for the period covered by such pay day. I cannot at this time say to you what proportion of your wages this amount will be, as it will depend entirely on the flow of business and the earnings of the company, but I will say that no amount from the current earnings will be applied on fixed charges or for bills or other indebtedness that have accrued prior to February 16th."

Under date of March 4th, the general manager was served with a notice, signed by the committee of all of the employés, which recited the first paragraph above quoted, and the following:

"Please be advised that the undersigned committee representing *the employés* of the Peoria Railway Terminal Company in your service, *take the position that the rates of pay for employés of this company are fixed by the United States Labor Board, and until such time as the Railway Labor Board may approve a change in existing rates, the undersigned employés will not accept a lesser rate of pay than fixed by decision No. 2* of the Railway Labor Board."

In other words, the employer had made it clear to the employés that, on account of the hopeless financial condition of the company and the depression in its business, the employés must take for their compensation the gross operating income of the company, less the current supply bills, or leave the service. The employés took the position that the employer could not fix the rate of compensation it would pay for the labor involved, for that power was vested by the Transportation Act of 1920 in the United States Railway Labor Board; that the attempt of defendant to fix the terms upon which its employés might remain in the service was a nullity; that they would remain in the service and require the defendant to pay what the Labor Board said was a reasonable wage.

After the conclusion of each semimonthly period, a pay roll would be made out, showing the name of the employé, his occupation, the rate of pay, the time, and the amount due, just as had been the practice before the times in question. The rate of pay in force on and prior to February 15th was used as a basis. These pay rolls were sent by the bookkeeper to the auditor in Chicago. Here the total gross operating receipts would be ascertained, the cost of current supplies for the period would be deducted from the gross amount, and the balance would be distributed upon the pay roll sheets to the several employés in proportion to the amounts that would have been earned under the old scale. The amounts finally extended to the accounts of the employés were from 75 per cent. to 82 per cent. of the sum that would have been allowed, had the business of the company permitted it. When the exact proportionate amount due each employé was ascertained, a line was drawn through the total amount shown by the pay roll, and the distributive share of the gross earnings written above that amount. Then pay checks would be issued to each employé, upon which certain memoranda were made, such as "Payment in full." Later, the line "In full for services to date" was printed underneath the amount named in the check.

Upon the filing of all of the wage claims, by agreement of counsel, the cause was referred to the master, who heard the evidence and reported, finding that statements written or printed in the checks, such as "Payment in full," or, "In full for services to date," did not change the contract of employment between the employer and employé, and that the employés should receive the difference between the wages they have received and the wages that they would have earned under the standard schedule of the Labor Board, which constituted the only contract of employment existing between said employer and employés, and that the employés are each entitled to recover the several amounts found by the master.

In other words, the master finds that the action of the Labor Board was controlling; that it had found what a reasonable schedule of wages was for the defendant company; that it was binding upon the employer and the employés; that it was the only contract existing between them. It must be stated that no complaint is made that the distribution of the gross earnings of the company

according to its own plan was not honestly and fairly made, nor is it charged that any improper amounts were deducted from the gross earnings before the basis of distribution for payments was ascertained.

The turning point in this entire matter rests upon the power of the Labor Board in matters of this kind. If Congress, in enacting the Transportation Act of 1920, took away from the railroads and their employés the power to establish wage scales, or to agree upon what one would give and the other would receive, then the exceptions to the master's report should be overruled; but the exceptions should be and must be sustained, if the effect of the Transportation Act is otherwise.

This case, in brief, is this: The defendant company, financially embarrassed and practically wrecked, went to its employés and told them it was willing to furnish the tracks, rails, and rolling stock and give them all the income earned as pay for doing the work, less the necessary current supply bills; that they must either work on that basis or quit. The employés said: We will not accept, and we will not quit, because we don't think you can say upon what conditions we shall work. In other words, we are going to work for you; but we are going to have the Labor Board make you pay what the Labor Board says is just and reasonable.

[1] The United States Supreme Court has settled the controversy involved here in a case arising in this circuit, by holding that the findings and the awards of the Labor Board are not binding, but are purely advisory. In other words, the Labor Board has said what rates of pay are reasonable; but the Labor Board can do no more, and it did no more. It was not the purpose of Congress to take away from employing masters in this country the right to employ railway employés and fix the rate of pay. Pennsylvania R. R. Co. v. U. S. Railroad Labor Board (Dist. Court, Judge Page presiding) 282 F. 693; U. S. Railroad Labor Board v. Pennsylvania R. R. Co. (C. C. A. 7th Cir.) 282 F. 701; Pennsylvania R. R. Co. v. U. S. Railroad Labor Board, 261 U. S. 72, 43 S. Ct. 278, 67 L. Ed. 536.

Chief Justice Taft, in the opinion just referred to, while discussing the act and the force and effect of an order of the Labor Board, used the following language: "It does not require employés to deal with their employers through their fellow employés. But we think it does vest the Labor Board with power to decide how such representatives ought to be chosen with a view to securing a satisfactory co-operation and leaves it to the two sides to accept or reject the decision. * * * All that we may do in this case is to hold, as we do, that they [the decisions] were within the lawful function of the board to render, and not being compulsory, violate no legal or equitable right of the complaining company."

Following the conference between the management of defendant and the men of February 17th, and the posting of the bulletin serving notice upon all employés under date of March 1st, at the instance of the employés, this controversy was brought to the attention of the Railroad Labor Board. The question as presented by the employés, and received and considered by the board, was set out in decision No. 1288, under date of October 26, 1922, in these words: "Protest against a reduction in wages made effective February 16, 1921, and request that carrier restore the rates of pay arbitrarily reduced without agreement to employés."

The decision contained in No. 1288 is as follows: "The Labor Board decides that the action of the carrier in reducing wages of the classes of employés represented by the organizations, parties to this dispute, was in violation of decision No. 2, and that the employés represented by the petitioners shall be reimbursed for the difference between the wages they have received and the wages they should have received under the orders of the Labor Board in effect."

It will be observed that the decision in the District Court by Judge Page was under date of May 4, 1921. In that opinion the learned judge said (282 F. 693–698):

"There is no direct provision in the Act that decisions by the board shall be final and have the binding force of decrees to be performed. Nor is there any provision that that which is determined to be a just and reasonable wage or rule shall thereafter be the wage or the rule as between the carrier and its employés and upon which either may maintain an action in the courts. There is no provision for the enforcement of the terms of the decisions, nor any penalties for their violation, except the publication provided for in section 313 [Comp. St. Ann. Supp. 1923, § 10071¼iii], if that may be considered a penalty. All these matters seem to me to indicate that the decisions are only advisory."

In that case the motion to dismiss the Pennsylvania Railroad Company's bill was denied. A decree was entered, and an appeal to the Circuit Court of Appeals taken.

The Court of Appeals reversed the District Court upon the theory that the bill sought to enjoin the Labor Board from making an investigation into the controversies existing between the Pennsylvania Railroad Company and its employés, but the decision of Judge Page was not reversed as to the force and effect of decisions and orders of the board affecting wages and working conditions. The Supreme Court affirmed the order of the Court of Appeals, but clearly affirmed the view of Judge Page as to the effect of a decision of the Labor Board. The decision of the Supreme Court was handed down February 19, 1923. The controversy involved in the Pennsylvania litigation was whether or not the board might decide how representatives of the employés ought to be chosen, with a view to securing a satisfactory co-operation. The Supreme Court held that it did have such power "with a view to securing a satisfactory co-operation and *leaves it to the two sides to accept or reject the decision.* The statute provides the machinery for conferences, the hearings, the decisions and the *moral sanction.*" 261 U. S. 72, 85, 43 S. Ct. 278, 283, 67 L. Ed. 536.

The Pennsylvania Railroad desired to prevent the employés in the controversy involved in the above decisions from enjoying the benefit of the moral sanction of publishing decision No. 218. The employés in this case have had the benefit of the moral sanction of decision No. 1288, but the moral sanction of such an order is an altogether different thing from a judgment or a decree of court commanding the payment of a sum of money.

[2] Much was said before the bar and in the submitted briefs as to the effect of the words "Payment in full," and "In full for services to date," which were written into the pay checks of the several claimants here, and as to whether or not the delivery to the claimants of the pay checks mentioned amounted to an accord of satisfaction. These questions may be disposed of by the reflection that it was within the power of either the carrier or the employé to terminate their relations under decision No. 2, on the 17th day of February, 1921. The management, in dire financial straits, with operating incomes insufficient to pay operating expenses, called the men together and told them that he had no disposition to disrupt wage scales or working conditions, but that the company would pay them all the income of the railroad proportionally after deducting the current supply bills; that, if they wished to continue

on that basis they could do so; if they did not, they should seek service elsewhere.

Did the management of defendant have the legal right and power to take this position? Regardless of its reasonableness or unreasonableness, its wisdom, fallacy, or otherwise, it must be held that it did. On the other hand, each of the employés had the perfect right to decline to accept the offer of the management. Under it there was no threat nor intimation that the full schedule of pay, found to be reasonable by the Labor Board theretofore, would not be paid, if there was any money with which to pay it. So that the legal effect of what the employés who continued in the service of defendant company did was to accept the proposition of the management, subject to the right of the Labor Board to investigate the reduction and give the parties the benefit of the moral sanction of a decision. The benefit of a moral sanction of a decision against a common carrier when published, where there is a controversy between employés and a carrier that is in a fairly healthy, operative condition, seeking public patronage and service, would be of great value, but the moral sanction of a decision against a railroad in the last stages of disintegration is of little or no value.

[3] A great volume of wealth had been poured into the defendant company in an effort to make it a successful enterprise, with complete failure as a result. To require a railroad company to continue in business at a loss is beyond the powers of Congress or a state. Apart from statute or express contract, people who put their money into a railroad are not bound to go on with it at a loss, if there is no reasonable prospect of profitable operation in the future. Bullock v. Florida, 254 U. S. 513, 41 S. Ct. 193, 65 L. Ed. 380; Brooks-Scanlon Co. v. R. R. Commission, 251 U. S. 396, 40 S. Ct. 183, 64 L. Ed. 323. Nor can a railroad company, or a receiver of a railroad company, be required to operate a railroad on a scale of wages which produces continuous loss, and which will finally eat up the corpus of the property. Under our constitutional system of government, there is no power, in or out of Congress, in a state, or in a judiciary, to compel those who devote their property to the use of the public to operate the same at rates of wages which occasion loss. In good morals, neither the public nor the employés should demand such sacrifice. Coffee et al. v. Gray et al., 158 Ga. 218, 122 S. E. 687.

Here, from the nature of the proposition

made by the management to the employés on February 17th, and put in more permanent form by the bulletin of March 1st, it was necessary for the management to take the position that it did, or shut down the road completely. Of the two unfortunate alternatives, the management seems to have adopted the one which would produce the least embarrassment to everybody connected with the property.

[4] It is also contended now that the proposition made by Mr. Battles to the employés personally on February 17th, and in the bulletin of March 1st, was that the difference between the amount of wages due according to the scale provided in decision No. 2 and what was actually paid was to pass to the credit of each employé and later to be paid. To so hold would be to do violence to the terms announced by Mr. Battles, according to the testimony of Mr. Hogue, and particularly the words used in the bulletin of March 1st, where it was said: "And the amount you so receive on each pay day will constitute your full and final compensation for the period covered by each pay day." It is clear, from the entire situation, that on February 17th the defendant company was being consumed by the excess of operating expenses over and above the income of the property.

[5] Did the defendant have the legal right and power to stop this process before it procured the consent of the Labor Board? There can be but one answer to this question. It did. Of course, it could not do so without giving the employés full, fair, clear, and positive notice of the proposed change in their relations. This was done. Those who continued in the service after receiving that notice must be held, as a matter of law, to have accepted the terms of the proposed change.

[6] The fact that the claimants here misinterpreted their rights under the Transportation Act would not warrant a court in ordering the receivers to make payment of the several claims involved. Furthermore, the opinion of Judge Page in Pennsylvania R. R. Co. v. United States Railroad Labor Board, supra, was published May 4, 1921, and was notice that the courts could find in the provisions of that act nothing making the decisions of the board final, or giving them the binding force of decrees to be performed.

The exceptions to the master's report will be sustained, and a decree may be prepared, disallowing and dismissing the claims allowed by the master herein.