## PENNSYLVANIA RAILROAD COMPANY *v.* UNITED STATES RAILROAD LABOR BOARD ET AL.

APPEAL FROM AND CERTIORARI TO THE CIRCUIT COURT OF
APPEALS FOR THE SEVENTH CIRCUIT.

No. 585. Argued January 11, 1923.—Decided February 19, 1923.

1. Under Title III, § 307, of the Transportation Act, 1920, the Railroad Labor Board has jurisdiction to hear and decide a dispute over rules and working conditions upon the application of either side, when the parties have failed to agree upon a settlement under § 301 and no adjustment board has been organized under § 302. P. 80.
2. In authorizing such application by any "organization of employees . . . directly interested in the dispute," (§ 307), the act includes labor unions. P. 81.
3. The Board has jurisdiction to decide who may represent employees in conferences under § 301 or in applying for hearings under § 307, and to make reasonable rules in advance for ascertaining the will of the employees in this regard. § 308. P. 82.
4. The Board was created, not as a tribunal to determine the legal rights and obligations of railway employers and employees, or to protect and enforce these, but to decide how such rights ought to be exercised for coöperation in running a railroad; its decisions have no other sanction than that of public opinion. P. 84.
5. The making of decisions and publication of violations in accordance with the procedure and within the discretion defined by the statute, cannot be enjoined by the courts. *Id.*

282 Fed. 701, affirmed.

This case involves the construction of Title III of the Transportation Act of 1920, c. 91, 41 Stat. 456, 469. The Title provides for the settlement of disputes between railroad companies engaged in interstate commerce and their employees, and as a means of securing this, it creates a Railroad Labor Board and defines its functions and powers.

The Pennsylvania Railroad Company began this action by a bill in equity against the Railroad Labor Board and its individual members in the District Court for the

Northern District of Illinois, where the Board has its office, averring that the suit involved more than $3,000, and praying an injunction against the defendants' alleged unlawful proceedings under the act and especially against their threatened official publication under § 313 of the Title that the Railroad Company had violated the Board's decision under the act.

The defendants moved to dismiss the bill on the ground that the suit was one against the United States without its consent, and also for want of equity and a lack of a cause of action. They also filed an answer making the same objections to the bill as in the motion and setting forth by exhibits more in detail the proceedings before the Board and its decisions. The District Court heard the case on the bill, motion and answer, and granted the injunction as prayed. The Board appealed to the Circuit Court of Appeals, which reversed the decree and directed the dismissal of the bill. The decree of the Circuit Court of Appeals, not being made final by the statutes, the case is brought here by appeal under § 241 of the Judicial Code.

On December 28, 1917, the President, by authority of the Act of Congress of August 29, 1916, c. 418, 39 Stat. 619, 645, took over the railroads of the country, including that of the complainant, and operated them through the Director General of Railroads until March 1, 1920, when, pursuant to the Transportation Act of 1920, possession of them was restored to the companies owning them. During his operation, the Director General had increased wages and established the rules and working conditions by what were called National Agreements with National Labor Unions composed of men engaged in the various railroad crafts. Further demands by employees through such unions were presented to the Director General and were pending and undetermined when the Transportation Act was approved. Conferences were held between the

heads of the labor unions, signatories to the National Agreement, and representatives of the railroads after the railroads were restored to private ownership, but without successful issue. When the members of the Labor Board were appointed and organized, April 15, 1920, it assumed jurisdiction of these demands and proceeded to deal with them. It rendered its decision as to the wage dispute on July 20, 1920, and postponed that as to rules and working conditions until April 14, 1921, when it decided that such rules and working conditions as were fixed in the so-called National Agreements under the Director General and had been continued by the Board as a *modus vivendi* should end July 1, 1921, and remanded the matter to the individual carriers and their respective employees, calling upon them in the case of each railroad to designate representatives to confer and decide so far as possible respecting rules and working conditions for the operation of such railroad and to keep the Board advised of the progress toward agreement. The Board accompanied this decision (No. 119) with a statement of principles or rules of decision which it intended to follow in consideration and settlement of disputes between the carriers and employees. The only two here important are §§ 5 and 15, as follows:

" 5. The right of such lawful organization to act toward lawful objects through representatives of its own choice, whether employees of a particular carrier or otherwise, shall be agreed to by management."

" 15. The majority of any craft or class of employees shall have the right to determine what organization shall represent members of such craft or class. Such organization shall have the right to make an agreement which shall apply to all employees in such craft or class. No such agreement shall infringe, however, upon the right of employees not members of the organization representing the majority to present grievances either in person or by representatives of their own choice."

On June 27, 1921, the Board announced that some
carriers in conference with their employees had agreed
upon rules and working conditions and others had not.
As to the latter the Board continued the old rules and
working conditions until it should render a decision as to
them.

In May, 1921, the officers of the Federation of Shop Crafts
of the Pennsylvania System, a labor union of employees
of that System engaged in shop work, and affiliated with
the American Federation of Labor, met the representa-
tives of the Pennsylvania Railroad Company. They said
they represented a majority of the employees of the Penn-
sylvania System in those crafts and were prepared to con-
fer and agree upon rules and working conditions. The
Pennsylvania representatives refused to confer with the
Federation for lack of proof that it did represent such a
majority, and said they would send out a form of ballot
to their employees asking them to designate thereon their
representatives. The Federation officers objected to this
ballot because it was not in accordance with Principles
5 and 15 of the Board in that it made no provision for
representation of employees by an organization, but speci-
fied that those selected must be natural persons, and such
only as were employees of the Pennsylvania Company,
and also because it required that the representatives of
the employees should be selected regionally rather than
from the whole system. The result was that the Com-
pany and the Federation each sent out ballots. The Fed-
eration then filed a complaint under § 307 of the Trans-
portation Act, against the Pennsylvania Company, com-
plaining on behalf of its members directly interested of
the Company's course in respect of the ballots. The Com-
pany appeared, a hearing was had and the Board decided
(Decision No. 218) that neither of the ballots sent out by
the parties was proper, that representatives so chosen
were not proper representatives and that rules and work-

ing conditions agreed upon by them would be void. It further appeared that the votes cast on the Company's ballots were something more than 3,000 out of more than 33,000 employees entitled to vote. The Federation had advised its members not to vote on the Company's ballots. What the result was in the vote of the Federation ballots did not appear. The persons chosen by the 3,000 votes on the Company's ballots conferred with the Pennsylvania Company's representatives and agreed upon rules and working conditions. The Board in its decision ordered a new election for which rules were prescribed and a form of ballot was specified, on which labor organizations as well as individuals could be voted for as representatives at the option of the employee.

The Company on September 16, 1921, applied to the Board to vacate this decision on the ground that there was no dispute before the Board of which by Title III of the Transportation Act the Board was given jurisdiction. After a hearing the Board declined to vacate its order but said that it would allow the Company to be heard on the question of the ratification of its shop craft rules by representatives of the crafts concerned when fairly selected.

Title III of the Transportation Act of 1920 bears the heading " Disputes Between Carriers And Their Employees And Subordinate Officials."

Section 301 makes it the duty of carriers, their officers, employees and subordinate officials, to exert every reasonable effort to avoid interruption to the operation of an interstate commerce carrier due to a dispute between the carrier and its employees, and further provides that such disputes shall be considered and if possible decided " in conference between representatives designated and authorized so to confer by the carriers, or the employees or subordinate officials thereof, directly interested in the dispute."

The section concludes:

" If any dispute is not decided in such conference, it shall be referred by the parties thereto to the board which under the provisions of this title is authorized to hear and decide such dispute."

Section 302 provides for the establishment of railroad boards of adjustment by agreement between any carrier, group of carriers, or the carriers as a whole, and any employees or subordinate officials of carriers, or organization or group of organizations thereof. No such boards of adjustment were established when this controversy arose.

Section 303 provides for hearing and decision by such boards of adjustment upon petition of any dispute involving only grievances, rules or working conditions not decided as provided in § 301.

Sections 304, 305 and 306 provide for the appointment and organization of the " Railroad Labor Board " composed of nine members, three from the Labor Group, three from the Carrier Group, and three from the Public Group.

Section 307 (a) provides that when a labor adjustment board under § 303 has not reached a decision of a dispute involving grievances, rules or working conditions in a reasonable time, or when the appropriate adjustment board has not been organized under § 302, the Railroad Labor Board "(1) upon the application of the chief executive of any carrier or organization of employees or subordinate officials whose members are directly interested in the dispute, (2) upon a written petition signed by not less than 100 unorganized employees or subordinate officials directly interested in the dispute, or (3) upon the Labor Board's own motion if it is of the opinion that the dispute is likely substantially to interrupt commerce, shall receive for hearing, and as soon as practicable and with due diligence decide, any dispute involving grievances, rules, or

working conditions which is not decided as provided in section 301."

Paragraph (b) of the same section provides for a hearing and decision of disputes over wages.

Paragraph (c) makes necessary to a decision of the Board the concurrence of five members, of whom, in the case of wage disputes, a member of the Public Group must be one. The paragraph further provides that

"All decisions of the Labor Board shall be entered upon the records of the board and copies thereof, together with such statement of facts bearing thereon as the board may deem proper, shall be immediately communicated to the parties to the dispute, the President, each Adjustment Board, and the [Interstate Commerce] Commission, and shall be given further publicity in such manner as the Labor Board may determine."

Paragraph (d) requires that decisions of the Board shall establish standards of working conditions which in the opinion of the Board are just and reasonable.

Section 308 prescribes other duties and powers of the Labor Board, among which is that of making " regulations necessary for the efficient execution of the functions vested in it by this title."

Section 309 prescribes that

"Any party to any dispute to be considered by an Adjustment Board or by the Labor Board shall be entitled to a hearing either in person or by counsel."

Section 313 is as follows:

" The Labor Board, in case it has reason to believe that any decision of the Labor Board or of an Adjustment Board is violated by any carrier, or employee or subordinate official, or organization thereof, may upon its own motion after due notice and hearing to all persons directly interested in such violation, determine whether in its opinion such violation has occurred and make public its decision in such manner as it may determine."

· *Mr. Frederic D. McKenney,* with whom *Mr. Frank J. Loesch, Mr. Timothy J. Scofield, Mr. Charles F. Loesch, Mr. Robert W. Richards, Mr. C. B. Heiserman* and *Mr. E. H. Seneff* were on the brief, for appellant and petitioner.

*Mr. Blackburn Esterline,* Assistant to the Solicitor General, with whom *Mr. Attorney General Daugherty* and *Mr. Solicitor General Beck* were on the brief, for appellees and respondents.

Mr. Chief Justice Taft, after stating the case as above, delivered the opinion of the Court.

It is evident from a review of Title III of the Transportation Act of 1920 that Congress deems it of the highest public interest to prevent the interruption of interstate commerce by labor disputes and strikes, and that its plan is to encourage settlement without strikes, first by conference between the parties; failing that, by reference to adjustment boards of the parties' own choosing, and if this is ineffective, by a full hearing before a National Board appointed by the President, upon which are an equal number of representatives of the Carrier Group, the Labor Group, and the Public. The decisions of the Labor Board are not to be enforced by process. The only sanction of its decision is to be the force of public opinion invoked by the fairness of a full hearing, the intrinsic justice of the conclusion, strengthened by the official prestige of the Board, and the full publication of the violation of such decision by any party to the proceeding. The evident thought of Congress in these provisions is that the economic interest of every member of the Public in the undisturbed flow of interstate commerce and the acute inconvenience to which all must be subjected by an interruption caused by a serious and widespread labor dispute, fastens public attention closely on all the circumstances

of the controversy and arouses public criticism of the side thought to be at fault. The function of the Labor Board is to direct that public criticism against the party who, it thinks, justly deserves it.

The main and controlling question in this case is, whether the members of the Board exceeded their powers on the facts as disclosed in the bill and answer.

It is contended by the carrier that the Labor Board can not obtain jurisdiction to hear and decide a dispute until it is referred by the parties to the Board after they have conferred and failed to agree under § 301. Undoubtedly the act requires a serious effort by the carrier and his employees to adjust their differences as the first step in settling a dispute but the subsequent sections dispel the idea that the jurisdiction of the Board to function in respect to the dispute is dependent on a joint submission of the dispute to it. If adjustment boards are not agreed upon, then under § 307, either side is given an opportunity to bring its complaint before the Labor Board, which then is to summon everyone having an interest, and after a full hearing is to render a decision. A dispute existed between all the carriers and the officers of the National Labor Unions as to rules and working conditions in the operation of the railroads. By order of the Labor Board, this dispute, which had arisen before the passage of the Transportation Act and before the Government had turned back the railroads to their owners, was continued for settlement before the Labor Board. That Board had been obliged to postpone the decision of the controversy until it could give it full hearing and meantime had ordered that the existing rules and conditions should be maintained as a *modus vivendi*.

Counsel of the Railroad Company insist that the Board had no jurisdiction to make an order or to take up the controversies between the Government Railroad Administration and the National Labor Unions; that when the rail-

roads were turned back to their owners each company had the right to make its own rules and conditions and to deal with its own employees under § 301, and that the jurisdiction of the Board did not attach until a dispute as to such rules and conditions between the company and its employees had thereafter arisen.

We are not called upon to pass upon the propriety or legality of what the Labor Board did in continuing the existing rules and labor conditions which had come over from the Railroad Administration, or in hearing an argument as to their amendment by its decision. It suffices for our decision that the Labor Board at the instance of the carriers finally referred the whole question of rules and labor conditions to each company and its employees to be settled by conference under § 301; that such conferences were attempted in this case, and that thereafter the matter was brought before the Board by Federation No. 90 of Shop Crafts of the Pennsylvania System under § 307. It is the alleged invalidity of this proceeding, thus initiated, which is really the basis of the bill of complaint of the Company herein, and it is this only which we need consider.

First, Did Federation No. 90 have the right under § 307 to institute the hearing of the dispute? Section 307 says that this may be invoked on the application of the chief executive of any organization of employees whose members are directly interested in the dispute. Its name indicates, and the record shows, that the Federation is an association of employees of the Pennsylvania Company directly interested in the dispute. The only question between the Company and the Federation is whether the membership of the latter includes a majority of the Company's employees who are interested. But it is said that the Federation is a labor union affiliated with the American Federation of Labor and that the phrase " organiza-

tion of employees " used in the act was not intended by
Congress to include labor unions.   We find nothing in the
act to impose any such limitation if the organization in
other respects fulfills the description of the act.   Congress
has frequently recognized the legality of labor unions,
*United Mine Workers* v. *Coronado Coal Co.*, 259 U. S.
344, and no reason suggests itself why such an associa-
tion, if its membership is properly inclusive, may not be
regarded as among the organizations of employees referred
to in this legislation.

The next objection made by the Company to the juris-
diction of the Board to entertain the proceeding initiated
by the Federation is that it did not involve the kind of
dispute of which the Board could take cognizance under
the act.   The result of the conferences between the Penn-
sylvania Railroad Company and its employees under § 301
appears in the statement of the case.   By a vote of 3,000
out of more than 30,000 employees, a representative com-
mittee was appointed with which the officers of the Com-
pany made an agreement as to rules and working condi-
tions.   Federation No. 90 for its members objected to the
settlement on the ground that it had not been made by
properly chosen representatives of the employees and
brought this dispute before the Labor Board.   The Penn-
sylvania Company was summoned and appeared before
the Board and the issue was heard.

It is urged that the question who may represent the
employees as to grievances, rules and working conditions
under § 301 is not within the jurisdiction of the Labor
Board to decide; that these representatives must be de-
termined before the conferences are held under that sec-
tion; that the jurisdiction of the Labor Board does not
begin until after these conferences are held, and that the
representatives who can make application under § 307 to
the Board are representatives engaged in the conference
under § 301.   Such a construction would give either side

an easy opportunity to defeat the operation of the act and to prevent the Labor Board from considering any dispute. It would tend to make the act unworkable. If the Board has jurisdiction to hear representatives of the employees, it must of necessity have the power to determine who are proper representatives of the employees. That is a condition precedent to its effective exercise of jurisdiction at all. One of its specific powers conferred by § 308 is to " make regulations necessary for the efficient execution of the functions vested in it by this title." This must include the authority to determine who are proper representatives of the employees and to make reasonable rules for ascertaining the will of the employees in the matter.

Again, we think that this question of who may be representatives of employees, not only before the Board, but in the conferences and elsewhere is and always has been one of the most important of the rules and working conditions in the operation of a railroad. The purpose of Congress to promote harmonious relations between the managers of railways and their employees is seen in every section of this act, and the importance attached by Congress to conferences between them for this purpose is equally obvious. Congress must have intended, therefore, to include the procedure for determining representatives of employees as a proper subject matter of dispute to be considered by the Board under § 307. The act is to be liberally construed to effect the manifest effort of Congress to compose differences between railroad companies and their employees, and it would not help this effort, to exclude from the lawful consideration of the Labor Board a question which has so often seriously affected the relations between the companies and their employees in the past and is often encountered on the very threshold of controversies between them.

The second objection is that the Labor Board in Decision 119 and Principles 5 and 15, and in Decision 218,

compels the Railroad Company to recognize labor unions
as factors in the conduct of its business. The counsel for
the Company insist that the right to deal with individual
representatives of its employees as to rules and working
conditions is an inherent right which can not be constitu-
tionally taken from it. The employees, or at least those
who are members of the labor unions, contend that they
have a lawful right to select their own representatives,
and that it is not within the right of the Company to
restrict them in their selection to employees of the Com-
pany or to forbid selection of officers of their labor unions
qualified to deal with and protect their interests. This
statute certainly does not deprive either side of the rights
claimed.

But Title III was not enacted to provide a tribunal to
determine what were the legal rights and obligations of
railway employers and employees or to enforce or protect
them. Courts can do that. The Labor Board was
created to decide how the parties ought to exercise their
legal rights so as to enable them to coöperate in running
the railroad. It was to reach a fair compromise between
the parties without regard to the legal rights upon which
each side might insist in a court of law. The Board is to
act as a Board of Arbitration. It is to give expression
to its view of the moral obligation of each side as members
of society to agree upon a basis for coöperation in the
work of running the railroad in the public interest. The
only limitation upon the Board's decisions is that they
should establish a standard of conditions, which, in its
opinion, is just and reasonable. The jurisdiction of the
Board to direct the parties to do what it deems they
should do is not to be limited by their constitutional or
legal right to refuse to do it. Under the act there is no
constraint upon them to do what the Board decides they
should do except the moral constraint, already mentioned,
of publication of its decision.

It is not for this or any other court to pass upon the correctness of the conclusion of the Labor Board if it keeps within the jurisdiction thus assigned to it by the statute. The statute does not require the Railway Company to recognize or to deal with, or confer with labor unions. It does not require employees to deal with their employers through their fellow employees. But we think it does vest the Labor Board with power to decide how such representatives ought to be chosen with a view to securing a satisfactory coöperation and leaves it to the two sides to accept or reject the decision. The statute provides the machinery for conferences, the hearings, the decisions and the moral sanction. The Labor Board must comply with the requirements of the statute; but having thus complied, it is not in its reasonings and conclusions limited as a court is limited to a consideration of the legal rights of the parties.

The propriety of the Board's announcing in advance of litigated disputes the rules of decision as to them is not before us except as to Principles 5 and 15 of Decision No. 119, so far as they determine the methods by which representatives of employees should be selected. They were applied and followed in the form of ballot prescribed by Decision 218. These decisions were necessary in order that conferences should be properly begun under § 301, and that disputes there arising should be brought before the Board. They were therefore not premature. It is not for us to express any opinion upon the merits of these principles and decisions. All that we may do in this case is to hold, as we do, that they were within the lawful function of the Board to render, and not being compulsory, violate no legal or equitable right of the complaining company.

For this reason, we think that the District Court was wrong in enjoining the Labor Board from proceeding to entertain further jurisdiction and from publishing its

opinions, and that the Court of Appeals was right in reversing the District Court and in directing a dismissal of the bill. We do not find it necessary, therefore, to consider the questions raised at the bar as to whether the Railroad Labor Board is a corporation under the act and capable of suing or being sued, without the consent of the United States, and whether the Board's publication of its opinions in matters beyond its jurisdiction could be properly enjoined by a court of equity.

*Decree affirmed.*