**PENNSYLVANIA SYSTEM BOARD OF ADJUSTMENT OF BROTHERHOOD OF RAILWAY AND STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYEES v. PENNSYLVANIA R. CO. et al.**

**PENNSYLVANIA RAILROAD SYSTEM AND ALLIED LINES FEDERATION NO. 90 et al. v. SAME.**

(Circuit Court of Appeals, Third Circuit. July 14, 1924.)

Nos. 3118, 3140.

**1. Master and servant ⬦69 — Decisions of Railroad Labor Board not enforceable by courts.**

Transportation Act 1920, tit. 3, § 300 et seq. (Comp. St. Ann. Supp. 1923, §§ 10071¼ee to 10071¼jjj), creating a Railroad Labor Board, confers on such board power to decide a labor dispute between a carrier employer and its employees when its jurisdiction is properly invoked; but this power of decision does not carry with it power of execution, nor does the act give to the prevailing party in such decision a right to its enforcement by the courts.

**2. Master and servant ⬦69—Refusal of party to dispute before Labor Board to obey its orders violates no legal or equitable rights of adverse party.**

While Transportation Act 1920, tit. 3, § 300 et seq. (Comp. St. Ann. Supp. 1923, §§ 10071¼ee to 10071¼jjj), confers on the Labor Board power to decide beforehand who may properly represent the parties to a dispute before it, and to prescribe rules by which to ascertain their will in that regard, and its

power to proceed to decision cannot be defeated by refusal of either party to obey its orders, compliance with such orders is not made compulsory, and a refusal to comply violates no legal or equitable rights of the adverse party.

**3. Injunction ⬦104—Refusal to obey orders of Labor Board cannot be charged as "conspiracy," against which equity may grant injunction.**

A party to a dispute before the Labor Board having no statutory right to enforce compliance by the other party with orders of the board, refusal of such compliance is not unlawful, and cannot be made the basis of a charge of unlawful consiracy. under Criminal Code, § 19 (Comp. St. § 10183), against which a court of equity may grant relief by injunction.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Suit in equity by the Pennsylvania System Board of Adjustment of the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees and by the Pennsylvania Railroad System and Allied Lines Federation No. 90 and others against the Pennsylvania Railroad Company and others. From a decree dismissing the bills, complainants appeal. Affirmed.

For opinion below, see 296 Fed. 220.

Hunt & Swiger, of New York City, and David Wallerstein, of Philadelphia, Pa. (Henry T. Hunt and Morris Hillquit, both of New York City, of counsel), for appellants.

John Hampton Barnes, of Philadelphia, Pa., for appellees.

Before WOOLLEY and DAVIS, Circuit Judges, and BODINE, District Judge.

WOOLLEY, Circuit Judge. These cases concern controversies between a railroad employer and its employees and call for an interpretation of Title III of the Transportation Act of 1920. 41 Stat. 456, 469 (Comp. St. Ann. Supp. 1923, §§ 10071¼ee to 10071¼jjj). Beyond this it is impossible to state the questions involved without first stating the facts from which they arose.

The two cases are against the same carrier, the Pennsylvania Railroad Company, and its officials. The first was instituted by bill in equity filed by the Pennsylvania System Board of Adjustment of the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees, setting forth grievances peculiar to the crafts indicated by the title of the complainant labor union; the second was instituted by a similar bill filed by the Pennsylvania Railroad System and Allied Lines

Federation No. 90, and certain persons as individuals and officials, stating grievances peculiar to the crafts indicated by the title of this complainant labor union; both asserting rights conferred by the Transportation Act (Comp. St. Ann. Supp. 1923, § 10071¼ et seq.), averring violations thereof by the Railroad Company and its officials, and praying that the Railroad Company and its officials be enjoined from further acting to their injury.

The law on which the two bills are based is the same and the facts on which they are rested differ only in those details which arise from differences in the crafts and their labor organizations. As the, action brought by the Pennsylvania Railroad System and Allied Lines Federation No. 90 (to which for convenience we shall hereafter refer as System Federation No. 90) embraces all questions raised in the action brought by the Pennsylvania System Board of Adjustment of the Brotherhood of Railroad and Steamship Clerks, Freight Handlers, Express and Station Employees (hereinafter referred to as Brotherhood of Clerks) and embraces one or two more, we shall, in an effort to keep this opinion within reasonable bounds, recite only the facts of the former case and then only those facts averred in more than one hundred printed pages of the bill which we think are pertinent. They are as follows:

Prior to December 28, 1917, the Pennsylvania Railroad Company (hereinafter referred to as the "Company") operated railroads in twelve states under what was commonly known as the "Pennsylvania System." The Company employed a large number of men in shop or mechanical work in and about the repair and maintenance of locomotives, cars, and other equipment and also a large number as clerks, freight handlers, express and station employees. Many men of all crafts were members of labor unions and many were not. Thorough unionization of these crafts was resisted by the Company which, being antagonistic to labor organizations generally, refused to recognize and deal with their unions, although it recognized and, under collective agreements, dealt with four other labor organizations, namely, the Brotherhood of Locomotive Engineers, the Brotherhood of Locomotive Firemen and Enginemen, the Order of Railway Conductors and the Brotherhood of Railway Trainmen, known collectively as the "Big Four."

On December 28, 1917, the President of the United States, by authority of the Act of Congress of August 29, 1916, c. 418, 39 Stat. 619, 645, took over the railroads of the country, including those of the Pennsylvania System, and operated them through the Director General of Railroads. On February 21, 1918, the United States Railroad Administration issued an order, known as General Order No. 8, which prohibited discrimination against employees because of membership or non-membership in labor organizations. In consequence of this order local unions and lodges of the national organizations of shop crafts of the Company became active and, in July, 1918, their representatives met at Altoona and formed the Pennsylvania Railroad System and Allied Lines Federation No. 90, one of the complainants. This relatively local labor organization became affiliated with the national organization of the American Federation of Labor. A full statement of the relation of these major and minor organizations is unimportant except to note that the constitution and by-laws of System Federation No. 90 showed an interdependence in action and provided against strikes by employees of any member craft unless authorized by that organization on a referendum vote and sanctioned by the American Federation of Labor. In the spring and summer of 1918, the war being on, the Railroad Administration issued several general orders revising and increasing the wages of shop craft employees, making the rates uniform throughout the country, establishing definite and uniform classification and discontinuing the system of piecework. Thereafter the Railroad Administration entered into an agreement with the national body of railroad employees of the classes here in question, represented by the American Federation of Labor and its affiliated organizations, including System Federation No. 90. This agreement, which because of its scope became known as the "National Agreement," further increased wages and dealt generally with conditions of labor. About February 1, 1920, the war being over, shopcraft employees and employees of other classes presented to the Railroad Administration a request for a still further increase of wages and for further modifications of the National Agreement concerning working conditions. With this request pending and undetermined, the Congress passed the Transportation Act which, being approved by the President, became a law on February 28, 1920. Under its terms federal control of railroads ended on March 1, 1920 and on that day all railroads, including those of the Pennsylvania System, were returned to their owners.

In order properly to understand the re-

maining facts of these cases it will be necessary to stop at this point and briefly review the pertinent provisions of the Federal Transportation Act—holding in mind the existence of the National Agreement and the pending demand for increase of wages.

The portion of the Act here in question is Title III, which provides for the settlement of disputes between railroad companies engaged in interstate commerce and their employees. Following closely the summary of the Act made in the report of the case of the Pennsylvania Railroad Co. v. United States Railroad Labor Board, 261 U. S. 72, 43 Sup. Ct. 278, 67 L. Ed. 536, Section 301 makes it the duty of carriers and their employees to exert every reasonable effort to avoid interruption to the operation of an interstate commerce carrier because of disputes between them, and further provides that such disputes shall be considered and, if possible, decided "in conference between representatives designated and authorized so to confer by the carriers, or the employees or subordinate officials thereof, directly interested in the dispute." The section concludes: "If any dispute is not decided in such conference, it shall be referred by the parties thereto to the board which under the provisions of this title is authorized to hear and decide such dispute."

Section 302 provides for the establishment of Railroad Boards of Labor Adjustment by agreement between any carrier, group of carriers, or the carriers as a whole, and any employees of the same. No such Boards of Adjustment were established when the controversy with System Federation No. 90 arose.

Section 303 provides for hearing and decision by such Boards of Adjustment of any dispute involving only matters not decided as provided in Section 301.

Sections 304, 305 and 306 provide for the appointment and organization of a "Railroad Labor Board" composed of nine members, three from a group representing labor, three from a group representing the carriers, and three from a group representing the public.

Section 307 (a) provides that when a Labor Adjustment Board under Section 303 has not, within a reasonable time, reached a decision of a dispute submitted to it, or when the appropriate adjustment board has not been organized under Section 302, the Railroad Labor Board "(1) upon the application of the chief executive of any carrier or organization of employees or subordinate officials whose members are directly inter-

ested in the dispute, (2) upon a written petition signed by not less than 100 unorganized employees or subordinate officials directly interested in the dispute, or (3) upon the Labor Board's own motion if it is of the opinion that the dispute is likely substantially to interrupt commerce, shall receive for hearing, and as soon as practicable and with due diligence decide, any dispute involving grievances, rules, or working conditions which is not decided as provided in section 301." Paragraph (b) of the same section provides for a hearing and decision of disputes over wages and paragraph (c) requires in a decision by the Labor Board the concurrence of five of the nine members, of whom, in the case of wage disputes, a member of the Public Group must be one. This paragraph further provides that, "All decisions of the Labor Board * * * shall be immediately communicated to the parties to the dispute, the President, each Adjustment Board, and the (Interstate Commerce) Commission, and shall be given further publicity in such manner as the Labor Board may determine." Paragraph (d) requires that decision of the Labor Board shall establish standards of working conditions which in its opinion are just and reasonable.

Section 308 prescribes other duties and powers of the Labor Board among which is that of making "regulations necessary for the efficient execution of the functions vested in it by this title."

Section 313 reads as follows:

"The Labor Board, in case it has reason to believe that any decision of the Labor Board or of an Adjustment Board is violated by any carrier, or employee or subordinate official, or organization thereof, may upon its own motion after due notice and hearing to all persons directly interested in such violation, determine whether in its opinion such violation has occurred and make public its decision in such manner as it may determine."

Returning to the situation as it existed at the time of the enactment of the Transportation Act when a demand for increase of wages and change of working conditions had but recently been made by carrier employees, it appears that between that date and the date of the organization of the Labor Board many conferences looking to the settlement of the dispute were held between heads of labor organizations, signatories to the National Agreement, and representatives of the railroads. Conferences between the Pennsylvania Railroad Company and its employees were not successful. When the

Labor Board was organized on April 15, 1920, it assumed jurisdiction of these pending disputes and proceeded to deal with them. On July 20, 1920, it rendered a decision upon the wage dispute but postponed decision upon the dispute as to rules and working conditions until April 14, 1921, when it decided that such rules and working conditions as were fixed by the National Agreement with respect to all railroads and had been continued as a modus vivendi should end July 1, 1921, and remanded the controversy to the carriers and their employees, calling upon them respectively to designate representatives for conference and asking them to keep the Board advised of their progress. The Labor Board accompanied this decision, known as Decision No. 119, with a statement of principles which thereafter it intended to follow in the consideration and settlement of disputes between carriers and their employees. Those here pertinent are Principles 5, 7 and 15. They read as follows:

"5. The right of such lawful organization to act toward lawful objects through representatives of its own choice, whether employees of a particular carrier or otherwise, shall be agreed to by management."

"7. The right of employees to be consulted prior to a decision of management adversely affecting their wages or working conditions shall be agreed to by management. The right of participation shall be deemed adequately complied with, if and when the representatives of a majority of the employees of each of the several classes directly affected shall have conferred with the management."

"15. The majority of any craft or class of employees shall have the right to determine what organizations shall represent members of such craft or class. Such organization shall have the right to make an agreement which shall apply to all employees in such craft or class. No such agreement shall infringe, however, upon the right of employees not members of the organization representing the majority to present grievances either in person or by representatives of their own choice."

In view of the approaching end of the National Agreement and in response to the general mandate of the Labor Board that carrier employers and employees compose their differences, representatives of the Company and of System Federation No. 90 met in Philadelphia on May 24, 1921. At this meeting the officials of System Federation No. 90 stated that their organization comprised a majority of the employees of the Pennsylvania System in the crafts named and that they had come as their representatives prepared to confer and agree with the Company in accordance with Decision No. 119 of the Labor Board. The officials of the Company questioned whether System Federation No. 90 spoke for a majority of its shop employees and for lack of proof refused to confer with its representatives. Moreover, the Company informed the representatives of System Federation No. 90 that, acting in pursuance of Decision No. 119 of the Labor Board, it would recognize organizations of its shopcraft employees but that the representatives of such organizations must be individuals actually in the employ of the Company and at work at the time in its service, and indicated that in order to be assured of this and of the authority of labor spokesmen, it would send out a formal ballot to these employees asking them to name thereon their conference representatives. Just here is the center of the controversy. The officials of the Company showed the officials of System Federation No. 90 the ballot which it intended to submit to its shopcraft employees for the selection of representatives to attend a conference to adjust the dispute. It appeared from this ballot that the Company proposed to divide these employees by Superintendent Divisions and members of each craft in each division were to vote for and elect three of their number to represent them in disputes arising in their division. If a dispute of a wider character should arise, provision was made for regional committees whose members should be selected by the division representatives previously elected by the employees of the several crafts. (All this involves matters of detail of which nothing more need be stated here than, when put into practice, the plan would carry out the purpose of the Company to limit conference representatives of its employees to natural persons and to those actually in its employ and at work.) The ballot also disclosed that employees on strike would not be allowed to vote. The representatives of System Federation No. 90 objected to this ballot because it was not in accordance with their understanding of Principles 5, 7 and 15 announced by the Labor Board in that it made no provision for representation of employees by a labor organization and excluded from conference everyone not in the Company's employ; that is, it excluded outside representation. On this question the opposing parties broke, with the result that the Company and System

Federation No. 90 each sent out ballots. The Federation advised its members not to vote the Company's ballot and the Company announced it would not recognize the Federation's ballot. Both parties actively and bitterly participated in the election that followed. The return showed that 5,236 employees actually at work voted the Company's ballot and 37,245 employees—embracing men at work and men on strike—voted the Federation's ballot. In due course the persons chosen by employees voting the Company's ballot met the Company's representatives in conference and formally entered into an agreement respecting rules and working conditions. The Company regarded this as an end to the matter. System Federation No. 90, however, promptly filed with the Labor Board a complaint against the Company under Section 307 of the Transportation Act. The Company appeared, and, after hearing, the Labor Board decided (Decision No. 218) that neither form of the ballots sent out by the parties was proper, that the labor representatives chosen on the Company's ballot were not lawful representatives and that, in consequence, the rules and working conditions agreed upon by them were void. The Labor Board then ordered a new election for which it prescribed rules and the form of ballot, specifying that labor organizations as well as individuals might be voted for as representatives of the employees. The Company refused to accept Decision No. 218 or to carry out its provisions and also refused to cancel the election already held or to abrogate the agreement it had entered into with its employees as a result thereof. The Company petitioned the Labor Board to vacate its order on the ground that there was no dispute before it of which the Transportation Act gave it jurisdiction. Upon its refusal the Company filed a bill in equity against the Labor Board and its members in the District Court of the United States for the Northern District of Illinois praying an injunction against them for their alleged unlawful proceeding under the Act and especially against their threatened official publication under Section 313 that the Company had violated the Board's decision. A preliminary injunction was granted. Pennsylvania R. Co. v. United States Railroad Labor Board, 282 Fed. 693. On appeal by the Labor Board the United States Circuit Court of Appeals for the Seventh Circuit vacated the injunction and directed a dismissal of the bill. 282 Fed. 701. Thereupon the Company took an appeal to the Su-

preme Court which, on February 19, 1923, interpreting the Act and deciding matters to which we shall advert later, affirmed the decree of the Circuit Court of Appeals. 261 U. S. 72, 43 Sup. Ct. 278, 67 L. Ed. 536. The Labor Board then, of its own motion, again requested the Company to comply with its Decision No. 218. On the Company's refusal it rendered Decision No. 1829 in which it held that the Pennsylvania Railroad Company "has violated decision No. 218 of the board, after the Supreme Court of the United States had upheld the board's right to render said decision, and has thereby denied to its shop employees essential rights as laboring men to which Congress has declared them entitled."

System Federation No. 90 formally informed the Company of the readiness of its members to resume work upon the terms and conditions established by the Labor Board. The Company refused this tender and adhered, and still adheres, to the agreement made with representatives of its employees elected in the manner indicated. These actions followed.

In concluding their bill the complainants contend that all "furloughed employees," that is, employees on strike, who were refused re-employment in accordance with their seniority rights, and employees "who were discharged by the Company for refusing to waive their rights under the Transportation Act," are entitled to recover damages for loss of employment. In addition they show that a large number of the Company's employees, members of System Federation No. 90, did not strike in the summer of 1921 but continued at work under the wages, rules and conditions established by the Company's alleged unlawful agreement with representatives of its employees and contend that they are entitled to be paid by the Company the difference between the amounts actually received by them and the amount they should have received at the rate of wages in force on the first of July, 1921. On the facts and contentions thus summarized the complainants pray for a decree restraining the defendant (Pennsylvania Railroad Company) from enforcing the provisions of the agreement with respect to wages and working conditions made between it and its employees on the vote taken; from enforcing any change in wages and working rules as they existed on June 30, 1921, that is, as they existed under the National Agreement; from continuing to deal with persons chosen on Company ballots as representatives of the employees en-

gaged in mechanical work; from financing, interfering with, directing and controlling the organizations of the Company's employees for the purposes set forth in the Transportation Act, and from refusing to confer and deal with System Federation No. 90 as the organization representing the great majority of the Company's employees engaged in such work. In addition the complainants ask for a decree for an accounting of damages sustained by members of System Federation No. 90 upon the grounds previously stated.

The theory of these cases is both negative and affirmative. It is negative in the sense that the complainants do not expressly ask the court to enforce any of the decisions which the Labor Board made in this dispute. Obviously, this is for the reason that the Supreme Court, in Pennsylvania Railroad Co. v. United States Railroad Labor Board, 261 U. S. 72, 43 Sup. Ct. 278, 67 L. Ed. 536, decided that orders of the board are not enforceable by the courts. Going a step further, they say their position is entirely independent of Decisions Nos. 119 and 218 of the Labor Board prescribing rules and form of ballot for choice of representatives by the employees, and of Decision No. 1829 declaring that the Company had violated its decision, although the practical effect of a decree granting the prayers of their bills would be the enforcement of these orders. The theory is affirmative in the sense that the complainants stand upon what they describe as their "civil and statutory rights," and, averring a conspiracy to deprive them of these rights, they invoke the injunctive remedy of a court of equity, in the absence of an adequate remedy at law, to restrain the respondents from continuing and completing such conspiracy to their injury.

From the length and intensity of the conflict indicated by our statement, as well as from the many positions taken and matters argued in the briefs, we find that, after all, the issues narrow to a single question— What are the civil and statutory rights of the complainants in the premises? This is the true question involved and upon its answer all others turn.

We do not understand just what the complainants mean by their "civil" rights. If they mean such as are accorded labor by general law—the right lawfully to organize, United Mine Workers v. Coronado Coal Co., 259 U. S. 344, 42 Sup. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762; the right to bargain collectively; the right to strike—no inva-

sion of such rights is shown and, accordingly, none is here in question. Moreover, the complainants have expressly grounded their actions on the Transportation Act of 1920 and, limiting their grievance against the respondents to their refusal to observe its terms, they have asserted that the conduct of the respondents is in violation of rights granted them by that Act in declaring a national policy in respect to railroad labor disputes. Thus both the pleadings and the facts show that complainants stand on their statutory rights. To these alone we shall address discussion.

[1] It is evident that in enacting the Transportation Act of 1920, and, through it, affording means by which to prevent interruption of interstate commerce by labor disputes and strikes, the Congress had the public interest first in mind. It was more concerned in protecting the public than in conferring rights upon railroad employers and employees. To this end it set up machinery which these contending forces could invoke to compose their differences, or which could be invoked against them. This machinery was novel in character and was intended to function not by ordinary process but by the force of public opinion. It did not disturb many of the rights which theretofore admittedly belonged to an interstate carrier and to its employees. The carrier's right to deal with individual representatives of its employees remained. The right of employees, who are members of labor unions, to select their own conference representatives without the right of their employer to restrict their selection to its own employees and exclude officers of labor unions was not abridged. Moreover, the "statute does not require [the carrier] to recognize or to deal with, or confer with labor unions. It does not require employees to deal with their employers through their fellow employees." Pennsylvania Railroad Co. v. Labor Board, 261 U. S. 72, 85, 43 Sup. Ct. 278, 283 (67 L. Ed. 536). With such rights preserved to these opposing forces and with no new rights of the kind here in issue expressly given them, the statute imposes certain duties and confers certain powers upon the Labor Board. One of these is the power to decide a labor dispute between a carrier employer and its employees. This power of decision, however, does not carry with it a power of execution. Obedience to decisions of the Labor Board is not compulsory; enforcement of its decisions rests solely upon public opinion marshalled on publication of the conduct of the offending party. This is

as true of interlocutory decisions as of final decisions. Though a decision be in favor of employees, we can not find anything in the statute which gives them a right to its enforcement by the courts.

[2] Having power to decide a dispute which has either been submitted to it or of which it has taken control of its own motion, the Labor Board also has the power to decide beforehand who may properly represent the parties and to prescribe rules by which to ascertain their will in this regard. This power cannot be defeated by the nonaction of a party; nor can its power to proceed to final decision be defeated by refusal of either party to obey its order. The action of the Labor Board by Decision No. 218 in finding the election of representatives by the Company's employees in the cases at bar void and prescribing a method and form of ballot for a new election was held by the Supreme Court to be within its power. Pennsylvania Railroad Co. v. Labor Board, 261 U. S. 72, 83, 43 Sup. Ct. 278, 67 L. Ed. 536. But this was the assertion of a right which the statute confers upon the Labor Board, not upon the parties to the dispute. A right of employer or employees to insist that the other proceed to a hearing pursuant to such rules as the Labor Board may have prescribed is not conferred upon either party to a dispute unless the statute makes it compulsory upon them. If compulsory, and if, as in this instance, the employer should refuse to obey the rules which the Labor Board has prescribed for an election of representatives and otherwise should fail to submit itself to the Labor Board, then by implication the statute might raise a right in the employees to have the dispute heard in the manner the Labor Board has provided and, conceivably, they might obtain enforcement of that right by legal process. But we find nothing in the statute which makes it compulsory upon the employer to confer with the representatives of the employees or further to contest the matter before the Labor Board. Though liable to such punishment as public opinion may inflict, the employer (and likewise, in a reverse situation, the employees) may, for any reason, or no reason at all, decline further to engage in the dispute. As obedience to the mandate of Decision No. 218 of the Labor Board respecting a new election of representatives was not compulsory upon the Company, its refusal to obey the decision violated no legal or equitable rights of the complaining employees. This is an instance where the machinery which the Congress set up did not work through to final decision and resulted in no punishment except that of public opinion directed against the Company by the announcement of the Labor Board's Decision No. 1829. As the Transportation Act of 1920 makes no provision for a situation where one of the parties defaults, it does not provide the other party (in this instance the employees) with means to coerce the defaulting party.

[3] Further asserting statutory rights in themselves, the complainants maintain that the conduct of the Company and its officers was a statutory offense in the nature of conspiracy under the provisions of Section 19 of the Criminal Code (Comp. St. § 10183) which provides that, "if two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the * * * laws of the United States," they shall be punished, and they further maintain that injunction will lie to restrain means for promoting such conspiracy. Pettibone v. United States, 148 U. S. 197, 13 Sup. Ct. 542, 37 L. Ed. 419; Duplex Co. v. Deering, 254 U. S. 465, 41 Sup. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196. Even so, the thing which is done or is threatened must in itself be unlawful, or, if lawful, it must be carried out by unlawful means in order to constitute a conspiracy. The thing here charged against the Company was conduct which, under the terms of the Transportation Act and in the light of the decision of the Supreme Court in Pennsylvania Railroad Co. v. Labor Board, supra, was not unlawful either in purpose or in means employed to carry out the purpose. It follows that in their conspiracy charge the complainants are not aided by a statutory right.

For these several reasons we are constrained to hold with the learned trial judge (294 Fed. 556 and 296 Fed. 220) that the complainants have not shown rights for the enforcement of which the processes of a court of equity are available.

The decrees of the District Court dismissing the bills are affirmed.