Argued at Pendleton October 29; reversed November 27, 1934

## BURTON *v.* OREGON-WASHINGTON RAILROAD & NAVIGATION CO. ᴇᴛ ᴀʟ.

(38 P. (2d) 72)

*Roy F. Shields,* of Portland (A. C. Spencer, of Portland, and Cochran & Eberhard, of La Grande, on the brief), for appellant.

*B. A. Green,* of Portland, for cross-appellants.

*Charles Z. Randall,* of Pendleton (Fee & Randall, of Pendleton, on the brief), for respondent.

BELT, J. This suit was commenced on April 23, 1932, under the Declaratory Judgment Act, to obtain a declaration of the seniority rights of the plaintiff, a second clerk telegrapher employed by the defendant railroad company. Plaintiff was employed on July 22, 1926, and was stationed at Kamela, Union county, Oregon, on the then second operating division of the railroad, which extended from Umatilla to Huntington. Excluding branch lines, the first operating division extended from Portland to Umatilla, and the third operating division included that part of the line between Umatilla and Spokane, Washington.

On June 1, 1931, the railroad company, for the purpose of convenience and economy, consolidated operating divisions one and two and thereafter designated the same as the Oregon division. The other division was known and designated as the Washington division. Soon after this consolidation of divisions—which it is conceded was within the exclusive province of the railroad company to make—a question arose as to the effect of such consolidation on the seniority rights of the telegraph employees located in the former first and second divisions.

At the time plaintiff was employed and about two years prior thereto, the railroad company had, pursuant to an agreement with the Order of Railroad Telegraphers, adopted and published a "Telegraphers' Schedule" which provided the terms and conditions of employment. Relative to the matter of seniority rights, which is the vital issue in this case, article 7, subdivision (b) of the schedule provided: "Rights to date from last

time of entering service on positions covered by this agreement and extend over division where employed.'' Plaintiff was not at this time a member of the Order of Railroad Telegraphers but it is admitted that when he accepted employment he became bound by the terms and conditions of the schedule. One of the principal questions in the case, however, centers around the interpretation of the above section of the schedule relative to seniority rights. Did the plaintiff have the same seniority rights after consolidation as he had prior thereto? Did the consolidation of the divisions effect a consolidation of the seniority rosters, or were the seniority rights of the employees not affected thereby?

The railroad company was not particularly concerned with this controversy existing between employees of the former first and second divisions and was willing to abide by the interpretation placed upon the schedule by the telegraphers' union which included in its membership between 80 per cent and 90 per cent of the employees of such class. Continued negotiations between the telegraphers' union and the railroad company finally resulted in a consolidated seniority roster effective October 13, 1931. At the time of these negotiations, plaintiff was a member of the Order of Railroad Telegraphers which, for brevity, will hereafter be designated the O.R.T. On the seniority list as adopted and published for the former second division, the plaintiff was listed as number 61. In other words, sixty of the employees on the second division had seniority rights superior to those of the plaintiff. Under the consolidated seniority roster, plaintiff was listed as number 177, there being 199 employees on such division.

On October 28, 1931, the plaintiff was replaced by the defendant Schatz, an employee from the former

first division. It may well be noted at this juncture that Schatz entered the company's service in 1908 and, by reason thereof, had 23 years seniority as against the plaintiff Burton's five years seniority. Thereupon Burton was assigned to a place on the "extra board" and he worked as extra man from time to time for a period of 19 days. On July 13, 1932, the plaintiff was taken from the "extra board" and completely relieved from service.

It is the contention of the plaintiff that the O.R.T. had no express or implied authority to bind him in any agreement with the railroad company relative to a consolidation of seniority rosters and that his rights are governed by the schedule in existence at the time of his employment. In plaintiff's prayer of the amended complaint it is asked that the consolidation of the seniority rosters be declared void and of no effect; that the schedule adopted and published by the company on September 20, 1924, be declared in full force and effect; and that plaintiff be reinstated in his position as second telegraph clerk at Kamela, Oregon.

From a decree in favor of plaintiff in accordance with the prayer of his complaint, the defendant railroad company and the defendant employees affected by such adjudication of seniority rights appeal.

Since the plaintiff relies on the schedule adopted and published when he entered the employment of the railroad company, it is well first to determine his rights thereunder before proceeding with the inquiry as to whether he was bound by the interpretation of the schedule relative to seniority rights as made by the O.R.T. after consolidation of the divisions.

It is clear that plaintiff's contract of employment was terminable at the will of either party. When he

entered the employment of the railroad there was no agreement, express or implied, that he would be assigned to any particular division, and we think it fair to assume that the plaintiff was cognizant of the fact that, in the years to come, there would be various changes in the manner and method of carrying on operations. It is not reasonable to assume that the operating divisions would remain the same regardless of changed economic conditions. We take it then that the consolidation of the operating divisions for the purpose of convenience and economy was not beyond the realm of reasonable anticipation by the plaintiff. Nevertheless, we are met with the contention that when plaintiff was employed and had established certain seniority rights on the former second division, he could not be divested thereof even though he was no longer employed in such division. The railroad company and the defendant members of the O.R.T. contend, however, that, when the consolidation was effected, the seniority rights of the telegraphers formerly employed on such divisions extended over the consolidated division.

The schedule under consideration is couched in the language of railroad men. Some of its terms are meaningless to persons not engaged in or familiar with railroad operations. Hence, when courts are called upon to construe such agreements or schedules, they are often compelled to resort to parol evidence in order to ascertain what the contracting parties had in mind. How did the parties themselves construe the schedule? How was it applied in the actual operation of the railroad? Did the terms used have a meaning peculiar to such business? These are questions with which this court is concerned.

What was the meaning of that part of the schedule which provided that seniority rights should "extend

over division where employed''? It is conceded that, at the time of the adoption of the schedule and when plaintiff was employed, the railroad had three operating divisions, each of which was under the jurisdiction and supervision of a superintendent. After the consolidation of the first and second divisions that part of the line was under the supervision of one superintendent whose office was in the city of Portland. How can the court pass intelligently on such question unless it hears and weighs the evidence of experienced railroad operators and representatives of employees familiar with railroad parlance? It is admitted in the reply of the plaintiff that a division of a railroad is defined by the rules of the defendant railroad company as ''that portion of a railroad assigned to the supervision of a superintendent''. We think evidence was, therefore, admissible that the word ''division'' had a use and meaning peculiar to those engaged in the railroad business: *Coast Fir Lumber Co. v. Parker et al,* 106 Or. 641 (213 P. 617), and numerous authorities therein cited.

We think it is established by the overwhelming weight of the evidence that the seniority rights of the employees under the schedule extend to the *operating* divisions where employed. Such, in effect, was the testimony of Mr. Finch, general manager of the defendant railroad company, who negotiated the schedule in question, of Mr. Vermillion, formerly general chairman of the O.R.T., and of numerous other witnesses. Considering the schedule in its entirety, we are convinced that when an operating division is enlarged or contracted the seniority district also enlarges or contracts. The seniority district, in the efficient and practical administration of the road, must conform to and be coextensive with the boundaries of the operating division.

When the consolidation was effected, plaintiff was no longer employed on the second division but he was employed on the new or Oregon division and his seniority rights automatically extended over the whole thereof.

Any other construction would lead to interminable confusion in the determination of seniority rights for it must be borne in mind that the determination of the seniority rights of one employee has its relation to and effect upon every other employee in the service.

Let us test the theory of the plaintiff. The following changes have been made in the O.-W. R. & N. divisions from time to time: Prior to March 24, 1911, there were two divisions, namely, the "Oregon division" and the "Washington division". March 24, 1911, the "Yakima division" was established when Yakima branch was put in operation and the seniority of telegraphers employed on it was restricted to this line. This made three divisions on the O.-W. R. & N. line. June 1, 1913, the "Oregon division" split into the "First division" and the "Second division" making four divisions on the O.-W. R. & N. line. August 3, 1913, the name of the "Washington division" was changed to the "Fourth division", and the name of the "Yakima division" was changed to the "Third division", there still remaining four divisions on the O.-W. R. & N. line. February 1, 1915, the "Third division" (old "Yakima division") was extended to include Riparia and territory south of the Snake river to Umatilla and Pendleton, excepting the Ayer line, which runs from the Snake river to Spokane. This newly added territory was taken from or cut out of the territory formerly in the "Fourth division" (old "Washington division"). May 1, 1923, the "Third division" and the "Fourth division" were consolidated into one designated as the "Third division".

June 1, 1931, the "First division" and the "Second division" were consolidated into the "Oregon division" and the name of the "Third division" was changed to "Washington division", placing the situation back to where it was prior to March 24, 1911, except as to incidental additions to the lines. In the light of these various changes in the operating divisions, let us apply the schedule, as interpreted by plaintiff, to telegraphers employed on the line between Riparia and the territory south of Snake river to Umatilla. Assume, as stated by counsel for the appellant railroad company, that:

A was employed at Riparia on January 1, 1915. His seniority rights would extend over the entire then Fourth division which included all of eastern Washington except the Yakima branch.

B was employed at Riparia on January 1, 1916. His seniority rights would extend over the Third division which included the Yakima branch but no other part of eastern Washington except the territory between Riparia and Umatilla.

C was employed at Riparia on January 1, 1924. His seniority rights would extend over the whole of eastern Washington and down to Umatilla, Oregon.

D was employed at Riparia on January 1, 1932. His seniority rights would extend over the whole of the present Washington division which includes all of eastern Washington and all of eastern Oregon north of Umatilla.

Thus it would appear that each of these telegraphers employed at Riparia would have seniority rights extending over widely different territory. Under article 8, subdivision (g), it is the duty of the superintendent at the beginning of January and July of each

year to prepare and file in his office a seniority list. What a difficult task this would be if the rule for which plaintiff contends be applied. It would require a jig-saw puzzle artist to make a seniority list if seniority rights of employees in the same operating division extended to widely different territory. It would seem to us, as a common sense rule, that such rights would extend only to the operating division where employed.

■ What construction did the employees and the company give to the schedule relative to seniority rights, prior to the adoption of the schedule under consideration? As stated by Lord Chancellor Sugden in *Attorney General v. Drummond,* 1 Drury and Warren 353, "* * * tell me what you have done under such a deed, and I will tell you what that deed means." The same rule of construction has often been applied by this court: *Jaloff v. United Auto Indemnity Exchange,* 120 Or. 381 (250 P. 717), and cases therein cited. Also see 13 C. J. 549, wherein it is stated:

"*Construction of similar contract.* T h e m o d e adopted by the parties in performing previous similar trade contracts is entitled to great weight in determining the meaning of the contract, especially where its meaning is doubtful."

The record discloses that, after the 1914 schedule was adopted, whenever a change was made in the operating divisions the seniority rule was construed to mean, and it was so applied, that territorial seniority rights coincided with the new railroad divisions. Thus it was, in order to avoid misunderstanding and contention, that the same language relative to seniority rights was employed in the various schedules thereafter adopted and published.

■ The plaintiff, however, urges that he was employed after the 1924 schedule was adopted and that therefore he is not bound by the construction given by the parties prior thereto. We can not agree with this contention. This schedule was a collective bargaining agreement between the railroad company and the labor organization representing the telegraphers: *Kessell v. Great Northern Railway Co.*, 51 F. (2d) 304; *Andrews v. Local Union No. 13*, 234 N. Y. S. 208 (133 Misc. 899); *West v. Baltimore & O. R. Co.*, 103 W. Va. 417 (137 S. E. 654); *Bancroft v. C. P. R.*, 30 Man. L. R. 401; *Burnetta v. Marceline Coal Co.*, 180 Mo. 241 (79 S. W. 136). It was executed "For the Railroad" by "J. P. O'Brien, Gen'l. Manager, O.-W. R. R. & N. Company" and "For the Telegraphers" by "J. V. Mitchell, General Chairman, O.R.T.". The schedule itself gave notice to the plaintiff, or any other person who entered the employment of the railroad company as a telegrapher, that the terms and conditions of his employment had been determined as a result of a collective bargaining agreement. Article 10, section (a), gave him notice that committee men had certain powers as to the "adjustment of differences between the company and the employees". Article 8 (d) notified him that there was a local chairman "representing the employees". Article 2 (c) gave him notice that changes in rates of pay for certain positions were to be fixed "by the General Manager or his representative and the General Chairman or his representative". Article 4 (b) 2 gave him notice that changes could be made in the hours of labor at certain places "when agreed to by the management and duly accredited representatives of the employes". Article 7 (f) gave him notice that on the transfer of a telegrapher from one division to another the preservation

of his seniority was subject to "the consent of the General Manager and the General Chairman". He was notified by article 5 (c) that even his starting and quitting hours of labor were subject to change "by mutual understanding between the local officers and employes' committee".

The railroad company recognized the telegraphers' union—since it included a majority of all telegraphers employed—as being a representative organization having authority to speak for the members of such craft. The railroad company believed in the principle of collective bargaining. It was impracticable to deal individually with its thousands of employees engaged in various kinds of work, so it determined on a policy of dealing with a representative organization which could speak with authority. Congress, at the time this schedule was adopted, had recognized the principle of collective bargaining in the enactment of the Railway Labor Act (45 U. S. C. A., section 132). Under the terms of this act, a Railway Labor Board was created to "make regulations necessary for the efficient execution of the functions vested in it by this chapter" (45 U. S. C. A., section 140). Pursuant to such authority, the Labor Board, on April 14, 1921, adopted Order No. 119, which, among other things, provided as follows: "The majority of any craft or class of employees shall have the right to determine what organization shall represent members of such craft or class. Such organization shall have the right to make an agreement which shall apply to all employees in such craft or class. No such agreement shall infringe, however, upon the right of employees not members of the organization representing the majority to present grievances either in person or by representatives of their own choice." The legality

of such order was sustained by the United States Supreme Court in *Pennsylvania Railroad Company v. United States Labor Board,* 261 U. S. 72 (67 L. Ed. 536, 43 S. Ct. 278), and thus it was after many years of strife and conflict that the right of collective bargaining was established. Indeed, in the schedule under consideration we find many references to the various orders of the Railway Labor Board. Since the railroad company was dealing with its employees collectively, as evidenced by the schedule itself, it will not do for the plaintiff, who accepted employment pursuant to the terms and conditions of the schedule, to say that he is not bound by the construction which the employees as a group gave to it. When plaintiff entered the employment of the company he was bound to accept the schedule as it came to him, to be read in the light of established practice and interpretation. There could not be an interpretation for one employee and a different interpretation for another one. It applied to all employees alike. Any other conclusion would do violence to the purpose and spirit of collective bargaining agreements.

The interpretation which we have given the schedule relative to seniority rights is in keeping with that of the plaintiff and numerous other employees on the former second division as evidenced by their petition to have article 7 (b) of the schedule amended by adding the following paragraph: "(2) When two or more divisions are consolidated. Employees affected shall have prior rights to all positions on their original division in accordance with section (B) 1 of this Article and accumulate seniority on new district from date of consolidation." This petition was sent to L. V. Vermillion, general chairman of the O.R.T., soon after the con-

solidation of the divisions and at a time when plaintiff was a member of the telegraphers' union. While the plaintiff protested at various other times concerning the consolidation of the seniority rosters, this petition certainly tends to show his construction of the schedule and the necessity for amendment. In other words, by this petition he impliedly admitted that a consolidation of the divisions necessitated a consolidation of the seniority roster, unless article 7 (b) were amended.

Having held that a proper construction of the schedule adopted and published in 1924, relative to seniority rights, is in accordance with the contention of the appellant railroad company and that of the cross-appellant employees and members of the Order of Railroad Telegraphers, it is not necessary to consider whether the plaintiff was bound by the interpretation of the schedule as made by the labor organization in 1931.

The decree of the lower court is reversed and one is entered here dismissing plaintiff's suit and declaring that the consolidated roster attached to the answer herein correctly shows and designates respectively the date and order of seniority of each employee therein named. Neither party will recover costs and disbursements.

Rossman and Bailey, JJ., not sitting.